EVA I. KINKADE, Appellant, v. JOHN P. KINKADE, Appellee.

Divorce: CRUEL AND INHUMAN TREATMENT: EVIDENCE. In this action for divorce on the ground of cruel and inhuman treatment the evidence of defendant's misconduct toward, and ill treatment of plaintiff, was not sufficient to show that her life was imperiled within the contemplation of the statute.

*Appeal from Humboldt District Court.*—HON. D. F. COYLE, Judge.

SATURDAY, FEBRUARY 14, 1914.

ACTION by plaintiff for divorce and $12,000 alimony. Plaintiff charged cruelty. After full trial plaintiff's petition was dismissed, and she appeals.—*Affirmed.*

*Healy & Healy* and *F. S. Lovrien,* for appellant.

*Kelleher & O'Connor* and *L. W. Housel,* for appellee.

PRESTON, J.—This husband and wife were not congenial. If the statute made that a ground for divorce, they would be entitled to relief, perhaps, though one is as much to blame as the other, if indeed plaintiff did not herself provoke and bring on a part of the trouble. In the later years they did not try to get along or to control themselves and fairly discuss their difficulties, but, as is often the case under such circumstances, each appears to have at times tried to be hateful towards the other. We have thoroughly examined the large record, and concluded that plaintiff has not established that her life has been imperiled by the conduct of the defendant.

At the time of the trial Mrs. Kinkade was forty-five years of age and defendant forty-two. When they were married, in 1891, plaintiff was twenty-five years of age. Prior to their marriage she had taught school and boarded in the family of defendant. Defendant has always been a farmer. There are two children, a son, Ray, nineteen years of age, a daughter, May, sixteen at the time of the trial. The plaintiff and defendant started in life with substantially nothing. Defendant now owns one hundred and sixty acres of land, upon which there is a mortgage of $1,300, an undivided half interest in another one hundred and sixty-acre farm, incumbered to the amount of $4,800, a residence property in Humboldt, valued at about $2,000, and some personal property. The net value of the estate is about $17,000, as claimed by defendant, to $25,000, as claimed by plaintiff. The value of the land has increased materially since it was purchased. They worked hard to accumulate this property over which they are now quarreling. They were both industrious and very economical and saving. Defendant has never been a drinking man and had no expensive habits. Plaintiff was a good woman, and did her part as a helpmeet for her husband in making and saving money, at least up to the time they left the farm. She now complains that during the years they were on the farm he did not properly provide for her. But she made no complaint of this at the time, and we are satisfied from the record that she was as close in

money matters as defendant, if, indeed, not more so, until after they had moved to town. She would have been satisfied with a less expensive house than the one they finally purchased. He tells of his buying a rug and clothing of better quality and higher price than she expected or intended. This is not disputed. They occasionally had crop failures, and times were hard during part of the time. As one witness puts it: ''While I was in that home they always got along while I was there as far as I know. We always had enough to eat. They always had enough to wear; all of them did. Of course, I know it was pretty hard times, those times. I don't know just what years those were. I think it was right around when Bryan was going around.'' Up to the time they moved to Humboldt, about the year 1907, the children were dutiful and the son was a good worker. They all worked hard. In fact plaintiff and defendant overworked. Neither one appears to have been in rugged health. Defendant had curvature of the spine, hemorrhoids, and kidney trouble. Plaintiff at one time had diabetes and some other ailments. At the suggestion of defendant they retired and moved to Humboldt. Up to the year 1909 or 1910 there was more or less fault-finding by each, and there were occasional differences.

Plaintiff complains of a transaction about 1895, when she claims defendant grabbed her by the shoulder and threw her to the floor. She is not corroborated as to this. Defendant denies it, and says she stumbled over a chair. There is no merit in the claim of plaintiff that defendant did not provide medical attention and care when she was sick. She claims he at one time, when they lived on the farm, whipped a horse severely. This is denied by defendant, and there is other evidence, outside that of the parties, tending to show that he is a good horseman and was kind to his stock. She also testifies to his beating a dog early in their married life. He admits he lost his temper in this transaction, but says the dog would not mind; had been worrying the stock, and at the time of the transaction had bitten his hand until it bled. She also

says he whipped the little girl when she was about five years old; says he struck her with a large whip, but she admits she was not present and did not see the transaction. He swears the child would not mind, and he used a toy whip of the son's. The child needed correction in a proper manner. He says, and it is not disputed, that this is the only time in his life he ever laid hands on her until she was 15 or 16 years old. Two other transactions, when he punished, or attempted to punish, the girl will be referred to later. Plaintiff seems not to have complained of the whipping of the girl at the time of the transaction. As indicating the attitude of plaintiff towards the defendant in these matters, the following from her testimony may be quoted: "As between my husband and my son, I have always sympathized with the son; as between my husband and my daughter, I have always sympathized with the daughter; as between my husband and the dogs, I have always sympathized with the dogs; as between my husband and the horses, I have always sympathized with the horses, in the cruelty part of it."

After their marriage they became church members, and had some differences over religious matters. She claims she gave up teaching Sunday school because of something he said, while he claims that she and the children sneered at him when he was saying grace at the table, so that he gave that up. She says he called her a sneak and a devil. Defendant admits that he told her she sneaked the son off to a field meet at another town and gave him the money, after defendant had refused to do so. On the other hand, there is evidence, and the trial court could have found, that at one time plaintiff called defendant a dirty son of a b——; at another time called him a pup; that she neglected him when he was seriously ill, and before he was taken to the hospital for an operation, and that she said it was put on, or a put-up job. As to the matter last mentioned, there is no dispute. It is to her credit that on the morning he was taken to the hospital, when she learned he was seriously ill, she went to him and told him she was

sorry she had said what she did, and was sorry she had not cared for him. This tends to show she still had some regard for him, although she testified that she had lost all her love for him and was done with him. As a witness, defendant says he still loves her. He generously excuses the children for their mistreatment of him, claiming that plaintiff had turned them against him. At another time she took the children to another state for several weeks, without consulting defendant, and did not let him know when they would return. When defendant would direct the son to do chores, or other work, he, the son, would go to the plaintiff to see whether he should obey. The son at one time, in the presence of the mother, and without correction, called the father a vile name. At another time the son, in a conversation with another witness, called the father the same name, and said his father might come to want some time, and if he did, he, the son, would not help him. At another time the son threatened to assault his father. In a letter written by plaintiff, she referred to a transaction in which she claimed the son had "flopped" his father.

There are many other circumstances for and against each party. That it is impracticable to refer to all of them will be apparent when we say that it requires 275 pages of the abstracts for the evidence of the two parties alone.

The daughter testified in corroboration of the mother in a few only of the matters complained of. The son did not testify for either. As to many of the transactions testified to there is no corroboration. The parties corroborate each other at some points, others are explained, and as to some there is a flat contradiction.

In 1909 there was a controversy about subscribing for a newspaper, in which plaintiff informed defendant, in effect, that she should do as she pleased in the matter. In the same year defendant punished the daughter for an insolent remark. As to this transaction, plaintiff says defendant struck the girl in the face with a paper rolled up, or a magazine, while defendant claims that it was an envelope in which he had re-

ceived an insurance policy. It appears that the daughter had started a letter and accused the father of trying to read it. She told her father what she was writing was none of his business, and then kicked him in the shins. At another time, when defendant had received a telegram from a sick relative and was about to take an early morning train, he asked his wife about a handkerchief, and the daughter said to him to shut up and go on. A few of the circumstances before enumerated occurred after March, 1910, but for the most part they show the situation and history of the case in a general way up to that time. At about that time she made, or caused to be made, a list of all the property, including the stock and crops on the farm, and consulted an attorney in regard to divorce and division of the property. She was advised by the attorney that she did not have sufficient evidence to justify suit, but that, defendant having gone so far, to wait, and he might go further. There was no attempt on her part for a settlement of their differences by a reconciliation. She informed the children of the result of the consultation with the attorney. Defendant claims that after this there was a change in the atmosphere of the home. At about this time, or soon after, plaintiff wrote to defendant's mother two long letters, giving her side of the controversy. In these she does not refer to the matters she now relies upon as grounds for divorce. In one of these letters she uses these words: "If he comes up and settles like a man, things will be all right, and if he don't, I shall make him smoke for all I can."

As we understand the record, defendant was in the hospital at the time this letter was written. He obtained the letter during the summer or fall of 1910. The matter most seriously complained about in the letters was a business transaction with one Briner. Briner was a cousin of defendant. Defendant had signed notes with Briner as surety, totaling about $1,700, prior to 1910, and had taken a chattel mortgage as security. Briner had a sale of his personal property, and defendant sought to enforce his lien. There was a lawsuit,

and defendant was successful in the main, though he admits he lost about $185, but obtained judgment against Briner for that amount. That suit was not tried until after the present action was begun. This matter was the subject of discussion between plaintiff and her husband; she criticised him for signing the notes, claimed that he was losing their money, and claimed that he was fraudulently protecting Briner from other creditors. Whenever anything came up she would mention the Briner matter. Defendant says plaintiff would not await the final outcome of the Briner affair, but concluded that defendant had lost his money. Defendant admits he made a mistake in signing the notes, and that he so told his wife. He testifies: "I told her that I had done wrong—I knew it—but I told her we all made mistakes, and I said it had not done Briner any good, all I had done for him, and I said, 'It has really done him harm;' and I says, 'It has not done me any good.' But, I says, 'It is too late now; we have got to make the best of it, and we have got to get out of this just the best way we can.' I told her I was sorry I had trusted him."

After plaintiff consulted the attorney, and after the writing of the letter above referred to, there was some friction about a pair of shoes and coats for plaintiff and daughter. Defendant advised a different kind of shoes for the girl than she wanted. Two coats were obtained, one for Mrs. Kinkade and one for the daughter, and they were paid for by the defendant, except $4, which was paid by plaintiff. She had not asked defendant to get the coats. She admits she had unlimited credit at the stores at that time, and she admits signing defendant's name to checks without objection on his part. Plaintiff worked out a part of the time after moving to Humboldt, but defendant had not asked her to do so, but, on the contrary, he had said she was not able to, and ought not to do so.

After the letter to defendant's mother, plaintiff bought two bills of furniture, amounting to about $85, without con-

sulting defendant. She says she knew he would not consent, and that is the reason she did not consult him. · He does not contend they were improper purchases, and he paid for the goods. He complains that he did not know what she was going to do. After the letter, and after some of these transactions, defendant consulted an attorney, who advised him to notify merchants to not extend credit. This he did personally, but with one merchant, who kept a general store, he arranged that they could get on his account whatever they needed in dry goods, groceries, etc. Defendant testified he told his wife of this arrangement, and that the reason for it was because he did not know what she was going to do next. Defendant testifies that he talked with his wife an hour or more that evening and told her that the trouble ought to be forgotten. He says they apparently had it all settled until they came to the Briner matter, then she said she would not listen to him any longer and got up and went into the house, and the daughter told him to shut his mouth; that she had heard enough of that. There are some other circumstances shown in the evidence tending to show that plaintiff had made up her mind to do as she pleased in these matters, and that plaintiff and the children were inclined to relieve defendant of the responsibility of acting as head of the family and in the management of his property.

The final chapter in this most unfortunate affair occurred in November, 1910, a few days before this suit was brought. At this time the daughter appears to have developed into a young woman. The evidence is she weighed 105 pounds two years before, when she was 14 years of age. Defendant had been husking corn, and was cleaning himself up in the kitchen. The daughter, May, had gone through the door several times and slammed it. Defendant spoke to her about it. They all agree that May then said: "Is this a private door?" Defendant testifies she also said: "It is none of your business." He went into the dining room and obtained a razor strap. He did not strike the daughter with it, but admits he tried to do

so. The mother interfered. There is a dispute as to just what occurred after that, but it seems plaintiff had a stove poker; defendant says plaintiff and May each had a poker, and one of them a broom stick. May kicked the swill pail over, spilling the contents on the floor, and during the mêlée some of them got down in it. Defendant denies striking his wife at all, but she says that in attempting to strike the girl he struck her. She also testifies in regard to this matter as follows: ''Q. The defendant's striking you, Mrs. Kinkade, was wholly unintentional, was it not? A. I couldn't say as to that. Q. You knew that it was not—you knew the only reason you were being harmed was because you were interfering? A. Certainly. Q. He never laid his hand on you in his life, with the exception of the first time that you spoke of here, back in 1895, until that time, had he? A. No, sir. Q. And you knew that the reason why he laid his hands on you that night was because you interfered with his attempt to chastise the girl? A. Yes, sir. Q. And you knew that if you hadn't interfered, he would not have touched you? A. Why I didn't know it, but I didn't think he would. Q. You knew John Kinkade well enough to know and to think that he would not have touched you if you didn't interfere in his treatment of the girl? A. Well, I don't think he would, no.''

This is not a case where a drunken or brutal husband has beaten an inoffensive, faithful wife. Defendant is not without fault, but, as before indicated, the plaintiff is not blameless. We have set out enough of the evidence to show this. The children have not treated their father with proper respect, nor has he used good judgment and proper control over himself in his relations with them. Many of the acts between plaintiff and defendant are trivial, and should have been overlooked and forgotten. Others are more serious, yet we are satisfied some of them have been magnified. The best thing for these parties to do is to forgive and forget; begin over again. It is the duty of defendant to support his wife and children according to his means and income, and they

ought to live within that and conserve their property. Plaintiff has now arrived at that time in her life when she will undergo a physical and mental change. It is the duty of defendant to treat her with kindness and consideration, and she should, of course, do her duty by her husband.

Such cruel and inhuman treatment as the statute contemplates has not been made out, and the judgment of the trial court is *Affirmed.*

LADD, C. J., and EVANS and WEAVER, JJ., concur.