BERNICE L. YOUNG, Appellant, v. JOHN A. YOUNG, Appellee.

**DIVORCE:** Grounds—Cruelty—Evidence—Insufficiency. Evidence held insufficient to justify decree of divorce on ground of cruel and inhuman treatment.

*Appeal from Buchanan District Court.*—GEORGE W. DUNHAM, Judge.

WEDNESDAY, JANUARY 12, 1916.

PLAINTIFF asks a divorce from the defendant on account of his alleged cruel and inhuman treatment, and for alimony. Defendant denies the facts alleged in the petition, and, after a full trial, the district court dismissed the plaintiff's petition, and from such ruling and judgment, the plaintiff appeals.— *Affirmed.*

*Hasner & Hasner* and *G. H. Phillips,* for appellant.

*Edwards, Longley, Ransier & Smith,* for appellee.

PRESTON, J.—There is no dispute between counsel as to legal propositions. Plaintiff contends that treatment which affects the mind to such a degree as to destroy health and endanger life is a cause for divorce, citing cases, and that unfounded accusations of unchastity may wound the feelings and destroy the wife's peace of mind to such an extent as to endanger her life, citing further cases.

DIVORCE: grounds: cruelty: evidence: sufficiency.

Appellee does not dispute these propositions, but says that a fact case is presented, and he relies upon the following cases to sustain the decree: *Kinkade v. Kinkade,* 164 Iowa 56; *Layton v. Layton,* 166 Iowa 74; *Meyer v. Meyer,* 169 Iowa 204.

It is a fact case. It will serve no useful purpose to set out all of the evidence of the parties and witnesses in detail, but we shall attempt to determine the matter by stating in a general way the claims of the parties and our conclusions.

The parties were married in January, 1901, and lived together until January, 1914. There were three children, the youngest being four years old at the time of the trial. It is claimed by counsel for plaintiff that she is a lady of refinement, and he concedes that the defendant is a man of more than ordinary ability. When the parties were first married,

they lived in the town of Lamont, for two years, and afterwards moved onto the husband's farm of 320 acres, which was later increased by the purchase of 80 acres more. The plaintiff's claim is that the defendant is worth about $60,000.00, and she asks a divorce and alimony in the sum of $25,000.00.

It is not claimed by plaintiff that the defendant was guilty of any personal violence, but that he was jealous of others, particularly one or two doctors, and that he accused her of improper relations with other men, and that such accusations were of frequent occurrence, and that, because thereof, her health and life have been affected. Some of the matters complained of were during the early part of the married life of these parties. There seems to have been trouble about 1903, after which there was a reconciliation between them. The first matter complained about by her was in regard to one Fred Draper, a nephew of defendant, and occurred during the first two years and before the reconciliation. Of this, plaintiff says in substance that defendant, at one time, came home and found his nephew at the house, and said that the plaintiff met him by date; that the young man was about twenty-one years old and was a son of defendant's sister; that the transaction happened on a Sunday morning, and that, on this morning, she did not go to Sunday School with her husband; that he wanted her to go, but that defendant said she stayed at home to meet Draper. Her evidence is that Draper came to the house and inquired for Mr. Young while defendant was at church, and that he came in and waited until Mr. Young returned, and plaintiff claims that, when defendant came, he ordered Draper out of the house. Plaintiff testifies that defendant called her and her mother and sisters vile names, charging them with being impure and unchaste.

Another circumstance testified to by plaintiff is that, while she was living in town, her cousin came to visit plaintiff's mother, and the plaintiff desired to visit her mother, and that defendant replied that, if she went, she could take her things and stay. When plaintiff returned to her home, with

her father, after this visit, she claims that defendant rushed at them with a revolver, threatening to shoot. Plaintiff had been away from home several days. The father testifies, in reference to the transaction, that defendant ran into the house and came out with a gun in his hand, and says, "I will fix them", and came towards plaintiff and her father; that defendant's sister grabbed hold of defendant, and witness says he does not know whether she was as strong as he or not, but that she held him until they got up to them. About two weeks after this transaction, there was a reconciliation between the parties, and they went to live together again, plaintiff stating that she "thought a lot of him"; and their differences were adjusted and they went to the farm to live, defendant promising to do better.

When the first child was born, a reputable physician was employed to attend her, and thereafter she had occasion to get medicine of him for the child, now and then, and plaintiff claims that defendant became jealous of her, and objected to her going to his office. At one time, a few days after the plaintiff had gone to the doctor's office for medicine for the child, defendant asked a witness who had nursed plaintiff whether she thought plaintiff did anything wrong in going to the doctor's office alone, and asked the witness whether she thought plaintiff was guilty of a misdemeanor, and this witness says that she told defendant that she did not think there was any impropriety, and she says defendant said he thought otherwise. Plaintiff testified that defendant frequently threw this matter up to her afterwards.

The next occurrence was in regard to a young milk hauler who hauled milk for the farmers to the creamery and stopped at defendant's house daily. It is testified that the milk boy stopped one day, and plaintiff showed him her incubator and the chickens that had been hatched, and plaintiff's claim is that, when defendant came home, he abused his wife and told her the young man did not come to see the chickens, but to see her. And it is testified by plaintiff that defendant was

jealous of the mail carriers; that he charged that their second son was not his child. Plaintiff claims that defendant accused her of having designs upon another young man, a nephew of defendant's.

A short time before plaintiff left her home, she sprained her knee, and another physician attended her. The doctor called to see her, and plaintiff's claim is that defendant came to the house and wanted to know what was up, and plaintiff explained how the doctor happened to call, and she says that the defendant charged her with being immodest, and stated that the only reason the doctor was there was "just to look at her leg." Plaintiff and defendant attended the Methodist church at Lamont, and so did the physician last referred to. Plaintiff says that, because of the defendant's jealousy of this physician, he insisted on her going to church at Aurora. Plaintiff says that, while she was lame, she wanted to go and visit her sister in Oelwein, and that defendant was angry about it, saying that, as soon as the children were old enough, he would give her her walking papers, and that he would not live with such a woman. She testifies that, on the day she left home, defendant was angry. The defendant retained possession of the three children when plaintiff left.

This is the substance and substantially all the circumstances relied upon by plaintiff. There is some evidence tending to support plaintiff's claim at some points, but it must be admitted that the corroboration is not at all strong. The case depends very largely upon the testimony of the plaintiff herself. She gives the names of persons who, she says, were the cause of the jealousy and in whose presence she claims the outbursts occurred, but she does not call these witnesses to support her statements, and offers no explanation for her failure to produce them. The first witness for plaintiff, Mrs. Voorhees, does not relate anything that occurred between plaintiff and defendant, but gives a conversation between the witness and defendant, in which he inquired as to whether witness thought plaintiff did anything wrong in going to the

doctor's office alone. The next witness is a domestic employed in the family, who had been there for some time. This witness does not testify to any continual charges of unfaithfulness and cruelty, as claimed by plaintiff. It would seem as though, if such treatment was incessant, as plaintiff claims, the domestic would have heard some of it; but the only circumstance testified to by this witness is that, when the doctor came to examine plaintiff's sprained knee, defendant said, "She just wanted the doctor to look at her leg." This was the fact, and any impropriety in the statement would necessarily depend upon the meaning of the witness, as shown by the tone of voice. The next witness, Bush, testifies to nothing that occurred before the separation, but testifies that defendant said he would not take plaintiff back,—at least that is the way the witness understood him. On cross-examination, the witness says that this was on the theory, as he understood it, that, as the parties were quarreling, he would not want to take her back. This is the substance of all the testimony in chief.

In rebuttal, plaintiff's father testified to the revolver transaction before referred to. It does not clearly appear what that difficulty was about, but there was no attack or assault on the wife at that time, and no contention with the wife. This transaction was before the separation and reconciliation, and thereafter they went to the farm to live.

The defendant denies in detail substantially all plaintiff's claims. He denies the Draper matter. Draper was not called to support plaintiff's claim, and it appears that plaintiff's sister was at the home the same day, and does not testify to any such conversation of the defendant's. The defendant flatly denies making any such charges as claimed by plaintiff as to the first doctor before referred to, and this doctor was the attending physician called by the defendant himself to attend the birth of two of his children,—at least one of these children was born after the alleged accusations against this physician. In regard to this physician, defendant testified, and it seems undisputed, that it was customary for plaintiff

to go into the office of this physician almost every time she went to town, and that, one day, plaintiff said to him that the doctor's wife came in, and plaintiff said, ''I have an idea his wife is a little jealous of me'', and that defendant said, ''If that is the case, it is time you are careful about not going in there unattended; because, if she is jealous of you, she won't give you any particular good standing, or say any good things for you: she might misinterpret your motive and say something derogatory in regard to your going there. Don't go there any more unless you are attended by me. or some lady.'' And that plaintiff said all right, she wouldn't. Defendant denies the testimony, in part at least, of Mrs. Voorhees.

If the doctor's wife was jealous of plaintiff, we think.it would not constitute cruel and inhuman treatment for defendant to caution her against a continuation of such visits. As to the milk hauler and the mail carriers, plaintiff does not testify that defendant charged her with any infidelity with them, but only that he thought it was improper for men to come to the house to visit a married woman when no one else was there. But, aside from this, defendant denies making the statements concerning them which plaintiff testified to. Defendant denies saying at any time that the second son was not his child. We think the defendant's conduct towards this son, in some measure, sustains his denial. As to the defendant's objection to plaintiff's going to the dentist's at Oelwein, on cross-examination plaintiff admitted that her husband took her to the train for that purpose, and gave her a blank signed check to pay the bill, and she admits that he took her to the train to go and visit her mother and sister. Another circumstance that perhaps we should have referred to is that plaintiff testified that defendant found fault with her because she went to a neighbor's with Ross Young, defendant's nephew. Defendant denies this, and Ross Young himself, as a witness, testifies that Mr. Young made no objections, but rather asked him to go with plaintiff. As to the revolver transaction, the defendant denies a part of the testimony introduced for plain-

tiff. He swears that he did not say that he would get the gun and fix them. He denies that he went into the house for it, but says that he carried it on his person. He admits, however, that his sister came out and took the revolver away from him, and he testifies that he was not going to shoot plaintiff or her father. His explanation is that he does not know why he had the revolver, but claims it was to make plaintiff's father get out of there, and he says he had no contention with his wife at that time whatever. The defendant's testimony and explanation of this revolver transaction are not entirely satisfactory or to his credit, and yet we think it cannot be properly claimed that, because of anything he said or did at that time, his wife's life was in danger. And that is the claim in this case. The trial court saw the witnesses and their manner and appearance, and, as we have said many times, we should give some weight to that fact. We have examined this evidence, and we are ourselves satisfied that, although these parties have not done right by each other, the plaintiff has not made a case warranting a decree of divorce.

As in many divorce cases, the situation is most unfortunate. Here are people who have not yet reached middle life, with three interesting children; they are well to do. They are responsible for bringing these children into this world, and they are abundantly able to take care of them and raise them properly to make good citizens, and it is their duty to do so. Though we hold that the evidence is not sufficient to justify a divorce, yet the defendant has not treated his wife with the consideration due to the mother of his children, and it may be that the wife has not always done as she should. The thing for these people to do is to get together and bury the past; to recall their marriage vows and perform their duty to themselves, to their children and to the state.

The judgment and decree of the district court are—
*Affirmed.*

EVANS, C. J., DEEMER and WEAVER, JJ., concur.