FLORENCE PENNINGTON, Appellee, v. S. W. PENNINGTON, Appellant.

**DIVORCE:** Non-Physical Violence. Cruelty flowing from acts other
1   than personal violence may justify a decree of divorce.
  SALINGER, J., dissents as to the applicability of the principle
to the present record.

**DIVORCE:** Allowance for Adult Children. No persuasive reason
2   exists for an allowance to a minor beyond a time when he can
and should provide for himself, especially when he who must
pay is aged, and of small earning capacity.

*Appeal from Monroe District Court.*—C. W. VERMILION, Judge.

NOVEMBER 16, 1918.

ACTION for divorce on the ground of cruel and inhuman treatment. There was a decree for the plaintiff, including the custody of the children, alimony, and costs. The defendant appeals.—*Modified and affirmed.*

*J. C. Mabry* and *John R. Price,* for appellant.

*N. E. Kendall* and *D. W. Bates,* for appellee.

EVANS, J.—The cruelty complained of does not include personal violence. The claim is that, for many years, the defendant has been guilty of a course of nagging conduct which has resulted in an irreconcilable separation of the parties, and in a serious impairment of the plaintiff's health. The evidence on behalf of the plaintiff is, in many respects, quite indefinite. The tendency of the evidence is to disclose a certain spirit and temperament in the defendant whereby he assumed to assert his authority over his wife in rather petty ways, and in matters which ought, ordinarily, to be left to her personal taste. While the defendant denies quite generally the specific instances recited by the plaintiff in evidence, yet his own evidence discloses the capacity and temperament to do the things with which he is charged by the plaintiff. For instance, he testified as follows:

1. DIVORCE: non-physical violence.

"I never denied her but one thing, so far as the living went. I never denied her but one thing in my life, to my recollection. We have often talked about that. I did deny her a hat once. I didn't want her to get a hat, and she wanted it, and I thought it was too young for her, and I thought I knew where the other one was, and told her where it was. I thought she didn't want it, and I was wrong—the hat was bought by a woman twenty years older than my wife, and the other one showed up. That is the only thing in my knowledge that I didn't give her. The woman that bought it, twenty years older. The other hat,—there were two hats, and I thought if the other hat went where I thought it did, that my wife would not enjoy her hat."

The foregoing was not a grave matter. No charge of cruelty is based upon it and nothing is claimed for it, but

it bears with some significance upon the other evidence in the case.

The defendant is about six years older than his wife. They were married at Albia, in 1886. They moved to Kansas, where the defendant operated a little bank and a lumber business, for a brief time. Thereafter, they moved back to Albia, where the defendant engaged for a short time in the furniture business, and thereafter in the banking business. He was instrumental in the organization of a new bank, of which he became the cashier, and so continued down to the year 1905. His father-in-law also was actively interested in the organization of this bank, and became a stockholder therein. Since 1905, the defendant has had no definite line of business. He has been occupied in miscellaneous ways. He has served as an accountant, and as an adjuster of fire losses in insurance cases, and as caretaker of property for others. He has been a man of fair business capacity, but of limited means and moderate income. Both husband and wife have been industrious and economical. Two sons, William and Bob, survive to them, their first having died in infancy. William was born in June, 1896, and Bob in January, 1901. The home in which the parties have lived for many years was given to the plaintiff by her father. It was, at the time, of moderate value, and in need of betterment. It was thereafter improved and enlarged, at a considerable expense. This expense was met principally by funds received by the plaintiff from her father. A substantial amount was also contributed by the defendant. The result of the improvement was a comfortable home. Across the street from this home was the home of plaintiff's father. The defendant seems to have conceived that he had an unpardonable grievance against the father-in-law, which he never communicated to the father-in-law, but frequently communicated to his wife. Because of this, it was the insistence of the defend-

ant that there should be no visiting by the plaintiff or by their sons at the home of the grandfather. This insistence was frequently disobeyed, sometimes clandestinely and sometimes openly. Out of the overflow of this central pool of discord, many discordant streams flowed. The merit of defendant's grievance against his father-in-law is not an issue before us. The defendant testified to his version thereof, nevertheless, and our attention is directed, in argument, to the fact that his testimony in that regard is uncontradicted. The father-in-law was not a witness. We have to say that we have been unable to see the slightest legal merit in such alleged grievance, nor do we see anything in the circumstances, independent of legal merit, that could reasonably excuse the attitude of the defendant. Through many years the wife has been made to feel the sting of the husband's hostility to her father. The "Perry blood" in her veins and in the veins of her sons has been habitually characterized as "dishwater." Many of her alleged faults have been attributed to her paternity. He has called her, not infrequently, a "wooden-headed ass." He has interposed his authority as a husband in petty ways in opposition to her plans. Such conduct by the husband is not necessarily fatal to the wife. Neither is it beneficial to her health. Upon the record as a whole, it must be said that the defendant was guilty of cruelty which had not even the mitigation of hastiness and heat of blood. It was cold and continuous. Indeed, the very pettiness of the subject-matter of some of the controversies only made them more intolerable. They were calculated to stir a spirit of resistance, and to disturb greatly the composure of a self-respecting wife. That the plaintiff suffered greatly therefrom is not fairly open to doubt; and that the impairment of health is the natural sequence of such suffering is quite evident. The direct evidence at this point is somewhat indefinite, but it is well corroborated by the circumstances.

The case presented is one of fact. It would serve little useful purpose to recite herein its details.. Plaintiff and the two sons testified in support of her petition. The defendant testified in his own behalf. The situation presents a lonely picture. The defendant is a man of standing in his community. He may have been quite unconscious of his own temperamental faults in his home. He may not have fully appreciated the cruelty involved in his attitude and conduct. He appears now to be desirous of a reconciliation. There was a reconciliation once, following a previous separation. The present separation began more than three years before the beginning of this suit. During that period of time, they have not shared each other's rooms though they lived under the same roof. The only wooing which the defendant has attempted has been by the epithets above quoted. We find in the record no effort on his part to win her affection or her forgiveness, or to draw the iron from her soul. Upon a careful consideration of the full record, we reach the conclusion that we would not be justified in interfering with the finding of the district court as to the ground of the divorce.

We reach the conclusion, also, that there ought to be a modification of the decree as to alimony. The plaintiff was awarded the home, which is held in 2. DIVORCE: allowance for adult children her own name, and which is worth from $3,000 to $4,000. She was also awarded all the household goods and furniture. She has also in her own name other real estate of the value of about $3,000. She has a natural expectancy of present generosity and future inheritance through her father. The decree provides that the defendant shall pay, in addition to the costs of the case, the sum of $25 a month for the support of the son Bob, until he becomes 21 years of age. The entire property left to the defendant consists of two or three equities in real estate, of a total value not exceed-

ing $2,000.  The defendant is past 60 years old; he is under some physical disability; his earning capacity is small.  We are constrained to the view that the payment of $25 a month for the support of Bob should continue only until he shall arrive at the age of 18 years.  This modification may well be deemed in the interest of Bob himself.  We can hardly conceive of an 18-year-old boy of spirit who would be willing to continue to receive for himself the fruit of the daily labor of an aged father or mother, even though the one be under condemnation as to his domestic obligations.  Bob's needs are not wholly financial.  He has the common need of all young men that he be industriously instrumental in his own support.  He spent one bad night with an automobile not his own.  This cost his mother $50, and became one of the contentions between husband and wife.  A day of hard work makes a good preventive to a night's wild ride.  The decree as to alimony will be modified to this extent.  The plaintiff appellee will pay her own cost of printing in this court.  In all other respects, the decree will be affirmed.— *Modified and affirmed.*

PRESTON, C. J., LADD, WEAVER, GAYNOR, and STEVENS, JJ., concur.

SALINGER, J. (dissenting).—I.  The parties were married in 1886, and have lived together until the fall of 1911.  Consideration should be limited to the issues joined.  The petition alleges that, during the period of most of the married life of the parties, the defendant has pursued a systematic course of cruel and inhuman treatment toward plaintiff, and that such course of misconduct is on the increase.  The specifications are:

(a) He has refused the plaintiff permission to visit the home of her father.

(b) He has continually talked to plaintiff about her father in a disrespectful manner, and has made every effort

to instill into the two children of the parties a hatred for the father of the plaintiff.

(c) Defendant has tried to instill into said children a dislike for the plaintiff. Of this there is no evidence.

(d) Defendant has told plaintiff repeatedly she was not a housekeeper (of this there is no evidence); that she did not know how to raise her children; that she didn't know anything (of these there is no evidence); and for years and repeatedly has called her a "wooden-headed ass."

(e) Defendant has stayed in the house for weeks at a time without speaking to plaintiff.

(f) Defendant has frequently told plaintiff to leave.

(g) Since the fall of 1911, though the parties have lived in the same house, they have not lived together as husband and wife.

(h) Plaintiff alleges that, during their married life, she has done "her very best to comply with her marriage vows."

We have recognized a tendency "to color" in divorce suits. *Pooley v. Pooley,* 178 Iowa 19. There is very much of such color present here, and this fact should be considered on the credibility of the witnesses for the plaintiff. Their attitude is made clear by one particular attempt to "bolster up" with a thing which, for some reason, was wholly overlooked in framing the petition,—an attempt which is one of many that indicate a desire to drag in any and all things that might blacken the father,—an attempt which not only bears upon credibility, but, as well, on the allegation of plaintiff that she "has always done her very best to comply with her marriage vows." The petition makes no mention of the use of intoxicating liquors by defendant. During the long time that plaintiff was on the stand in support of her main case, no use of liquor was mentioned by her. In the further progress of the trial, the two boys became witnesses for her, and they injected a

statement about the father's keeping liquor in a fishing camp, to which he at times took the boys and his wife; that he used too much liquor; and, in effect, that, at least on one occasion, he came home from the camp drunk. The mother was recalled, and she emphasizes all this, and adds a detailed description of offensive vomiting, on one occasion when the husband returned from the camp. Neighbors of unimpeached standing, including one of the judges of the district court, who have known the defendant intimately for a lifetime, unite in saying that he never drank to excess. The husband says he never came home drunk, and explains the occasion of the vomiting by saying that something that he had eaten at the camp poisoned him. In this he was fully corroborated by the physician who was called in on the occasion, and who said that the man was sick from food poisoning, and not from the use of liquor. To round it all out, it appears that, in the past, the plaintiff has joined the defendant in his moderate use of liquor. In the same case is voluminous testimony to the effect that the defendant made objections when plaintiff proposed to improve her homestead. Not only is there no such item in the petition, but the plaintiff finally admits that, though objection was made, the husband spent much time and his own money in making improvements upon the homestead. Nor is this all the "lug in." The awful fact was testified to that the father did not go beyond socks and handkerchiefs in making Christmas presents to the children. The unnatural father differed from the mother on whether one of the boys should have a new suit or wear an older one for a while. I rejoice that this villainy was atoned for; for the cruel and tyrannical husband ran true to form (as will appear later), and "compromised" by buying the new suit. The petition gave careful attention to just what epithets were part of the chain of life-endangering cruelty. It is content with less than calling plaintiff a liar. If such an epithet had been

seriously used, it is almost incredible that the petition would have made an enumeration of less than liar and omitted liar. But we have testimony of a long quarrel over cutting off a piece from a "lariat rope;" and that, in course of it, and to support the contention that it was a hammock, and not a lariat rope that had been cut, or to rebut that contention, defendant said she had lied. This is said here to show the "color." But it is not amiss to add that the husband says he used no such epithet, and but met her statement of what she had done with a statement that she had not.

With this "color" in mind, I address myself to the evidence in support of what is charged, and to whether what is proved makes a case of statute cruelty, and has endangered the life of the plaintiff.

II.   There is no proof of the charge that defendant has tried to instill in these children a dislike for plaintiff.

Is it shown by a preponderance that defendant has refused plaintiff permission to visit the home of her father?

Much is made of the claim,—at least this is true on paper,—of a refusal to let the plaintiff visit at the home of her father. According to plaintiff, following a former separation, three or four or five years ago, she and her husband made up, without advance knowledge on part of her father and her stepmother; but the parents accepted the reconciliation, and, as soon as they learned about it, they wanted them to come there, and asked plaintiff if her husband would come home now, and they could all be a family together. This does not seem to involve any question of visiting, but a proposal to have the Pennington family make its home at the Perry house. It seems that the husband said that this would be hard, "but it would come to that, too." She concedes that, the first year or two after marriage, they had visiting and cordial relations with her father's family; that the husband just seemed to get mad and stop,

because he wouldn't go there, and he didn't; and that he said to her, "I wouldn't think you would want to go to that house, after the way they have treated you and me. What are you going there for? You are my wife;" and she understood that "he was attempting to restrain me from going there"—which is certainly a rather broad deduction from what was said.

I can find no other evidence that plaintiff was prohibited or restrained from visiting the home of her father. And defendant testifies that, while they had differed "about the subject" of her going to the Perry home, they had talked about it very little; that, at one time, he said to her, "Why do you go there, if they treat you like you tell me they do?" And she said it was her father's home, and she would go there. He concludes with the statement that he never in his life forbade her going there.

The rest of it is not an attempt to restrain the plaintiff, but is, if anything,—what is not complained of in the petition,—an attempt to restrain the young children from going there. It begins with an alleged objection to having a baby taken there. Next comes an inquiry by defendant whether the mother knew where Will was, at a time when he was still a small boy, to which he added, "Did you know that he was there? I can't stay away from the bank and watch them. I have to be up at the bank, and it is your business to keep them away from there." Further, that, until the boys got big enough to run around on their own account, he continued to object to their going over there. True to form, however, the children went there frequently, though it is claimed the father forbade it, conceded that their going was not concealed, and that both Robert and his mother have been at the Perry house frequently.

It appears further that the father-in-law and grandfather was almost as frequent a visitor at the Pennington home as Pennington was at the Perry home: that is to say,

that Perry didn't visit the Pennington home at all, in recent years.

### 2-a

Is it so proved that defendant has continually talked to plaintiff about her father in a disrespectful manner, and that he has made every effort to instill hatred for the grandfather in the minds of the children?.

Plaintiff says he told her what a Mr. Stubbs had given to his daughter when she married, and he kept referring to it, and he thought the conduct of her father was awfully cheap, because he had given her nothing but a little Bible. She remembers his mentioning this on two occasions; but she adds, "At no time has he said anything to me as to my father's character or integrity, or anything outside from what I have spoken of." This, however, does not prevent her from saying that she heard defendant mention her father had been guilty of fraud or skullduggery of some kind, in connection with the opera house; that he talked a good deal about it, and claimed her father had defrauded him out of some scenery in the old opera house, which afterwards burned. It was when the boys or plaintiff would do anything that displeased defendant that he would say they couldn't help it: and he would tell the children, in her presence, that the Perry blood was dishwater; that they couldn't help it; it was the Perry in them. But the son Robert says that he will not say that it was frequently said.

When the mother wanted a suit bought for the son, the father thought it should wait, though he finally bought the suit and paid for it. It is charged he tried to dissuade the boy from having the suit, because, if his mother bought it, it would be taking blood money, because it was money coming from the boy's grandfather.

According to plaintiff, her husband told her that, the way her father had acted, he didn't think it was right to have her father's picture in the library and on a bookcase.

It seems, too, that the picture was found, turned down or thrown behind the bookcase, "or there was a deck of cards on it nearly every day." Finally, the picture disappeared, and she got another, and it was put down behind the bookcase a number of times, and it disappeared in the course of two weeks more. It is left somewhat an open question whether the husband was responsible for the disappearance.

From the standpoint of the defendant, there was some justification for his alleged attitude towards his father-in-law. He seems to have felt that one exchange proposed by the father would, to say the least, not be advantageous to plaintiff. What he said in disparagement of the father seems to have amounted to no more than an impeachment of the merits of the trade proposed by the father; that, at one time, when the father proposed to convey a lot to plaintiff and to treat it as an advance, at the rate of $100 a foot, the husband said she should not be charged that much for the lot, and that, instead of $1,600, the father should make it $1,200.

The defendant insists that, while his wife was in her first confinement, he found her crying; that, on inquiry, she informed him she had been insulted in her father's house, by intimations that the defendant had delayed marriage longer than he should have done. Plaintiff concedes that the child born in her father's house was a premature birth. She denies that, while in bed with her first confinement, he found her crying, and that, on inquiry as to what was the matter with her, she told him she had been insulted in her father's house. She denies other of the details narrated by the husband, but not all of them.

Defendant shows, quite in detail, what is not a wholly unreasonable justification for the belief that the father-in-law had, to say the least, not treated him very kindly in a business deal connected with an interest in the local opera house.

While it is not material what the father told the children about their grandfather, where it does not appear that the mother knew of it, it does appear that he claimed to his son that the grandfather had beaten the grandmother out of money, and how the grandfather had tried to beat defendant by pushing him out of the bank; that the Perry family had mistreated defendant, and were born enemies of Pennington's; that the grandfather hadn't treated the plaintiff as well as he should. It seems that, at one time, the plaintiff was of the opinion that her father had not given her what he should, in his circumstances, and that defendant joined in this view. Plaintiff merely "believes" that she never told her husband "of a particular way or manner in which I thought my father had mistreated me," and that she did not tell him, "on many occasions," that her father had not treated her justly with reference to her mother's estate.

### 2-b

Is it so proved that defendant has told plaintiff repeatedly that she was no housekeeper, and that she did not know how to raise her children, and that she didn't know anything, and that, for years, he has repeatedly called her a "wooden-headed ass?"

The plaintiff testifies that "the only epithet he ever applied to me was 'Oh, you poor ass;' this is what he generally called me, if I didn't do things right—'Oh, you poor wooden-headed ass.'" She says it was his common way of speaking to her, when he was angry and wished to depreciate her, and that it got so it really didn't make any impression on her, though it did at first. Robert says he has heard the father call the mother a "wooden-headed ass," and believes that is all he can recollect at the present time, and that this was done when the father was angry. It will be noted this is no statement as to frequency. To the like effect is the testimony of the son Will. The defendant says that the ex-

pression was quite a usual one with him. Definitely, it was used but once. The plaintiff had proposed to settle up the wrongful taking of an automobile by one of the boys at some extravagant figure, and defendant said, in connection with trying to persuade her that the matter could be adjusted without such extortion for merely avoiding a frightening of the son, that, when she said she was going to pay it, he told her she would be a "wooden-headed ass" if she did so.

### 2-c

Is it so proved that defendant has stayed in the house for weeks at a time without speaking to plaintiff? It seems —although the record shows variances—that plaintiff believes the husband would get angry if she suggested anything in variance with him (how much his differing from her amounted to is elsewhere dealt with) ; but even then "he wouldn't say so much, but he would get mad, and wouldn't speak to me." After this had continued for a long time, she would ask him what she had done,—what the matter was that they couldn't understand each other? and he would say everything would be all right if she would just behave herself, although he didn't tell her what was the matter; and days and weeks have gone on "when he wouldn't speak, any more than answer, if I would ask a very important question." Sometimes he would come home and find her crying. It is not stated for what. He would then ask her what in the world was the matter with her; and, though she complains that he did not speak, she also asserts that, when he found her crying, he should have said nothing to her; would walk through the house and wouldn't talk to her,—that is, he was mad, and wouldn't answer: this was mostly some ten years ago. Even then, he would speak to the extent of saying he thought it best for her to take some little trips; and she went, because she had a pass.

That would end it for quite a while, and when she returned, he would be in better humor, until the next time.

Sometimes the not speaking consisted of going through the house "in a very boisterous manner,—or not boisterous, but he was tense. He was just simply tense, and very cold." He sent her and the children on a trip to California, and furnished the larger part of the cost. Thus culminated one period of his failing to speak to her. In this instance, this failure continued for some months before the trip was taken, and consisted in his answering her "when I would ask him the necessary questions." Being asked if he spoke at this time about as much as she did, she answered, "When I would ask him a question,—yes."

In recent years, this has not been very serious, because, "since then, I have come out from under his influence some, —he hasn't dominated me."

2-d

Is it so proved that defendant has, for a considerable period, wrongfully refused to cohabit with plaintiff?

Plaintiff says it was about three years ago that he ceased coming to her room; that his not coming was at the instigation or request of neither; that it began after the children were born. He said he could not sleep, with children in there. "And once in a while he would come back; but after Will was born, he said he could not sleep, with children in there. But there was no rupture of any family relations on that account. He always preferred to have his own bed to himself." She adds, quite frankly: "It was indifference between us that we could not. We could not be in contact with each other to talk, hardly. We did not care to go out together or anything, for the last few years;" and that "I never requested that he renew the family relations, and he did not request it of me." His version is:

"Sometimes she would say she was sick. Whenever I would go to her room, she wouldn't go. If I would go to

her room, she would be sick; but finally she put the chair against the door, and I never went back again. If I would go to bed, she wouldn't go to bed."

### 2-e

The claim that he ordered her to leave is scarcely worthy of serious consideration. It seems to consist mainly of remarks that she would have to leave, if she would not do something he wanted,—which finally ended in the husband's furnishing the means to take trips abroad, as to one of which she says that, when she returned, they were happy. Another sample is that he told her she couldn't live with him unless she let him take away a box (presumably, filled with money). At any rate, he said this to get money that he expended on remodeling her house.

The whole claim on this point is an utterly strained one.

### 2-f

According to plaintiff, he has been "mad," when she went to say good-by to him; that he would be mad about everything, and she wouldn't know what about; that he was just mad all the time. She qualified by saying that this was not true all the time, but only by spells, and that he principally got mad if she cried. The record does not disclose why she cried. Finally, she says she doesn't know whether she ever got mad, herself, or not, but not at the particular times when he would get mad; and she closes this part of the affair by saying that, of course, she has been angry,—"anyone does."

### 2-g

He didn't want to return from Kansas to Iowa, because he was prosperous in Kansas; but he did come, because his father-in-law and his wife urged him to.

According to the plaintiff, she had considerable controversy with her husband at the time she sent the son Will to Simpson College, and the husband was very bitter against

it. The outcome was the usual one in contests between this tyrannical and dominant husband and his subdued and mistreated wife,—the son went to Simpson. He went to the college "I had selected," although the husband said "Will couldn't go to the college." Being asked whether she had her way about where he should go to college, and that he should go, she answered, "I certainly did,"—and this, though defendant had a leaning toward Iowa Wesleyan University, whose supporter his father was, and in which the father used to have a scholarship; and though Mount Pleasant, where that school is located, was the home of his (defendant's) parents and his friends. He learned that the boy was going there when he came home one night and found a new trunk, and on inquiry, was told that Will was going to college, and where.

The parents of plaintiff were communicants in the Episcopalian church, and she, herself, was born and baptized in that church. But the parents of the father were Methodists, and, even if plaintiff does not know whether her husband is one, that does not change his testimony that his people were Methodists, and, in a way, that, as long as he stayed at home, he was born and raised a Methodist. He was of opinion that most, if not all, of his enemies were in the Episcopalian church fold, and he liked neither the people in that fold nor its ministers. All of it makes it natural enough that either had a desire as to where the children should affiliate. Now, according to plaintiff, her husband said that neither boy could be baptized or confirmed in her church; she proceeded to call in a lawyer, on the claim that the husband had promised that he would not interfere with her plans for the church affiliation of the children; and the husband rebelliously responded that he didn't care if she called forty "Mabrys." Her church won; and when he returned from the ceremonial, she laughed at him, and smiled, and said, "Who got the worst of it?" Take

any view of the testimony, and it casts a bright light on the weakness and crushing of the wife, and the tyranny and dominance of the husband.

III.   The most claimed in pleading for injury to health is that the treatment complained of has shattered the nervous system of plaintiff, and that she is in almost a nervous collapse—without claim that it was due to such treatment; that the treatment has affected her health greatly, has broken her in health, and caused several serious spells of sickness. In the main, all testimony as to suffering, condition of health, and the like, does not undertake to say what caused that which is detailed. Plaintiff says her nervous condition appears to become worse, from time to time, but does not say what caused that; she says she can't remember in what years her nervous condition was worst. Some witnesses speak to finding plaintiff nervous, but not to what caused it. There was testimony as to chills and pneumonia; but, of course, it is not claimed that any act or omission of the defendant caused these. Sometime within 10 or 15 years ago, plaintiff called in a doctor, for becoming "prostrated" because her husband "was trying to get that money away." This money she says he eventually used in remodeling her house.

Plaintiff testified, over objection, that the conduct of the defendant had the effect of greatly worrying her, but makes no attempt to show that such worry had any tendency to endanger her life; and it appears that, while this worry, whatever it was, has been going on for 25 years, it has not had the effect of producing any gray hairs. She has times when sleep is broken from nervousness, and when she doesn't eat or sleep well. But there is no evidence as to what caused this, nor as to what its effect was.

Some attempts to state the cause of health conditions are manifestly incompetent conclusions, and were duly objected to. One of them was an attempt by a witness to

state·a version of affairs given her by plaintiff, and a statement that the witness understood the conduct of the husband had been injurious to the health of the wife. One piece of testimony as to the effect of the alleged treatment is a conclusion and opinion dealing with the future, and consists of a statement that plaintiff does not think—in fact, she knows that she and her husband can never live amicably together again; that she could have no sense of security or comfort as his wife; and that she fears, if they lived together as husband and wife, that it would result in a complete breakdown of her health.

True, she makes the general statement that the conduct of defendant has had the effect of rendering her nervous, and has resulted in her prostration at different times. But she called in no doctors in several years. Finally, plaintiff modifies matters by saying that she is not in a total nervous collapse—"not especially a total collapse of any importance;" but that, the afternoon on which she was testifying, she was very much worn out; and that in recent years the nervous trouble has moderated, because she has been more free from domination and tyranny: and the boy Will says his mother has been nervous ever since he has been large enough to notice such things; but that she seemed to be fairly well, before he left for school recently; that, the two times he was home this fall, she seemed to be feeling pretty good, and seemed more contented, after this divorce suit was commenced.

She confesses the calling her a "wooden-headed ass" finally had no effect whatever on her. She concedes that, for a year or two, no reference has been made to the failure of her father to make her presents.

She was asked whether she meant to assert that her health had been so impaired as to endanger her life, and answered: "If I did anything in the way of activities outside the home: I can do things in the home, but I can't

go beyond my strength." Then, on a repetition of the ques-
tion, she answered: "Well, I don't know whether it would
endanger my life or not."

3-ä

Witnesses who have known the defendant for a life-
time, and intimately, say that his disposition was kindly,
and that he was easy to get along with. They never heard
him address his wife improperly. ·They saw nothing un-
seemly in his conduct. They saw nothing out of the way;
everything looked pleasant to them. He seemed always
very solicitous for the welfare and condition of his wife.
She says:

"There never was any violence applied. He never
struck me. He never made any threats of violence. He
never made any threats, any more than that I couldn't live
with him if I didn't do certain things."

I concede there are cases which, rightly enough, hold
that cruel and inhuman treatment does not necessarily in-
volve a finding of physical violence. But the slightest ex-
amination of them shows how inapplicable they are here.
*Shook v. Shook*, 114 Iowa 592, is typical. It is therein held
as just stated; but it was in·a case where the husband
habitually nagged the wife, accused her of unchastity and
criminal conduct, cursed her, and made her the victim of
countless petty criticisms, both in private and in the pres-
ence of others. I concede, too, that, in a measure, each
divorce suit must be decided on its own facts. None the
less, the right to grant a divorce comes from the leg-
islature; and, though the facts in the cases may differ,
the standard must still be, whether the conduct may,
in reason, be said to endanger life. It would fill a volume
of our reports to note the cases, but it is worse than un-
necessary to note them. While that is so, one who has
read many of them can enable himself to ·say that the
case law will not sustain the granting of a decree,
because it has often been decided that such decree was

unwarranted where the facts, though differing in whole or in part from the facts in the case under consideration, clearly were more of a justification for divorce than the facts in the case at bar. In *Sylvester v. Sylvester,* 109 Iowa 401, decree granting divorce was reversed, though defendant was guilty of unmanly and brutal conduct, in connection with conduct on plaintiff's part equally reprehensible. The conduct in question is many times stronger than anything that can be found in the case before us. I may affirm as much for *Blair v. Blair,* 106 Iowa 269; *Naumann v. Naumann,* 182 Iowa 420; *Knight v. Knight,* 31 Iowa 451, 457; *Wells v. Wells,* 116 Iowa 59, at 60; *Coffin v. Coffin,* 155 Iowa 574; *Doolittle v. Doolittle,* 166 Iowa 625; *Layton v. Layton,* 166 Iowa 74; *Young v. Young,* 173 Iowa 424; and *Olson v. Olson,* 130 Iowa 353.

In *Hall v. Hall,* 162 Iowa 653, there was evidence that the wife was a nervous wreck, and other evidence which, on the whole, exhibits at least as serious effect upon health as is found in this case; and we reversed, on the ground that the conduct had not endangered the life of the wife.

In my opinion, no "legal cruelty" is made to appear, and no effect that even tends to endanger life. At best for plaintiff, it is a case of incompatibility. It is all fairly well summed up in her statement: "The punishment I have known has been in the way of bondage. It has not met with my expectations; what I hoped it might be."