CARRIE B. ANDERSON, Appellant, v. AXEL R. ANDERSON, Appellee.

DIVORCE: False Charges of Infidelity. False charges of infidelity
1  made in a pleading constitute cruel and inhuman treatment, especially when aided by oft repeated, vile, and abusive language.

DIVORCE: Alimony—Division of Property. Evidence reviewed,
2  and held to require a decree equally dividing the real estate of the parties.

*Appeal from Polk District Court.*—JOSEPH E. MEYER, Judge.

NOVEMBER 22, 1919.

REHEARING DENIED MAY 22, 1920.

ACTION for divorce. The ground alleged is cruelty. After a trial, the court dismissed the petition. Plaintiff appeals.—*Reversed.*

*Henry & Henry,* for appellant.

*E. J. Frisk* and *J. L. Gillespie,* for appellee.

PRESTON, J.—1. The parties were married December 1, 1901. She was past 49 years of age, and he was about the same age. She had been married three times, and secured a divorce from each of her husbands. She told defendant of two of her marriages. She had a son by a former marriage, who was about 18 years of age, at the time these parties were married. She

was a woman of average intelligence. He was a bricklayer, a steady, hard-working man, but could not read or write, and had little, if any, education, and had had but little business experience. He, turned over his wages to her, until she returned from California, in the spring of 1918. Defendant then told plaintiff that she had managed the business for 8½ years, and that thereafter he would manage it himself. They at first lived in Des Moines, but later exchanged the town property for acreage, just outside the city limits, where they built a new brick house, defendant doing the brick work. Plaintiff had some money of her own, which went into the new property. She had, before this, purchased a considerable amount of household goods, which she testifies, she paid for. The deed to the new property was taken in the name of both of them, or of the survivor of the other. Plaintiff testifies that this was the arrangement, and it seems not to be seriously disputed by the defendant. He says he saw the deed, but doesn't remember whether he heard it read or not. They seem to have gotten along fairly well until about December, 1917, at which time plaintiff claims defendant's treatment of her changed. The doctor testifies that he first treated plaintiff two or three years before that, and that, at that time, she was extremely nervous, had some temperature, from which he suspected she might have tuberculosis (but, at the time of the trial, he was of opinion that she did not have that); that she was broken down in health, and he advised her to go to California through the cold weather. She went to California on December 13th. About February 21, 1918, defendant caused her to be notified to return home at once, and that she would receive all the medical attention that she required. Upon receipt of this letter, she wired for ticket and traveling expenses, and received a wire back that ticket would be furnished at the depot, and $5.00 in money. She then had $50, which she had borrowed from her son, who then had a family. On her arrival home, she went to bed, and, a week afterwards, it was decided that she must go to

the hospital for an operation. She testified that he swore and cursed her, in connection with the operation, and said:

"God damn your soul to hell, you are grunting and sick all the time, and you can't work, and what in hell good are you? What are you laying around here for?"

She says that, the night before she went to the hospital, she invited her son and his wife to supper. The daughter prepared the supper. Defendant came in, and found the daughter getting the supper. He got his own supper, and ate it in the kitchen. While she was at the table, he came to the door, and said:

"God damn you, you said you were sick; but, by God, you are able to go to the table and eat like a hog."

This circumstance is testified to by plaintiff and her son and his wife. It is denied by the defendant. She went to the hospital that night, and was operated on the next morning, and was on the operating table $2\frac{1}{4}$ hours. She testifies that she asked defendant to go to the hospital with her, but that he refused to do so. He testifies that the reason he did not go, was because he couldn't stand it to be present; and there is other testimony that, when she started to go, he assisted her into the conveyance, and that he cried and told the doctor to take good care of her. The next Sunday after the operation, which occurred on Friday, he went to her room in the hospital. She testifies that he was so angry he was white, and raised his arms and hands like a crazy man, and cursed her soul to hell, and said everything abusive that he could say, because she had everything cut out of her; that he said she wasn't a woman, and he wasn't going to live with her; that he cursed and swore at her, because she couldn't have children; that, prior to that, he had always objected to children; that he stayed in the room about an hour and a half, but showed no affection of any kind. He testifies that he took her flowers to the hospital three times. The first time, he gave them to the nurse, and thought his wife did not know him. He went to the hospital again, the next Tuesday night after his work, and

brought a note for $230 from the bank for her to sign. She says it was a renewal note, but he claims it was to pay some of the bills that she had made. She told him she could not sign it, because he had refused to give her any money since she got home, and that he had said he never would, and there would be no use for her to sign it. She testifies that he swore and cursed, and tried to make her sign it, and she said she could not lift her hand, she was so weak and sick. The next Thursday night, he went again, and she testifies that he cursed and swore, and that she finally signed the note. She testifies that, at this time, there was no sign of affection, or at either visit, and that he wanted to know, with an oath, how long she was going to lie there, and that he said:

"By God, I suppose you know what it is going to cost for you to lay here. We will never get that note at the bank paid, as long as you lay around like this."

He denies that there was any friction or cursing, and says that he kissed her, and inquired how she was getting along. She was in the hospital a little over two weeks. When she returned home, she was not able to move her feet on the floor, or lift them. When she stood up, two persons had to hold her, and a third move her feet. She was in bed two weeks, after she got home, and then began sitting up a little. After she had been home about a month, her son telephoned her to take a ride, and defendant objected to it. He admits that he objected, but puts it on the ground that it was too cold for her to ride, as she had been in bed. Plaintiff testifies that defendant always objected to her son, and referred to him as "that God damn kid." This he denies. The next morning after plaintiff took the ride with her son, there was trouble between the parties, with reference to a woman who had been helping plaintiff do the housework. Plaintiff testifies that, after that, defendant swore at her and cursed her continuously. She says:

"He was never in the house for an hour at a time without cursing and swearing at me. From that time on, he would

say, 'God damn you, ain't you going to get out of bed?' 'God damn you, ain't you going to fix my lunch?' and just curse. I told him that I could not work, on account of my health, and the doctor had cautioned me about pumping or carrying water; but I had to do it, and he came home and swore at me because I did not pump the water for the chickens. We had a cow and calf and pigs and chickens and garden; and, from the time the woman left, I did my own housework. Mr. Anderson got his own breakfast, but I managed to get his supper and put up his lunch. I often asked for help, but he said, 'By God, you can do it or let it alone.' "

She testifies that the cursing continued, and that, about June, she could not stand it there, was sick and nervous and weak, and nobody to do the work; so she went to her son's, and has been there ever since. Thereafter, this suit was brought, August 6, 1918. She says that, the last twelve nights she was at home, defendant stood over the foot of her bed, and cursed and waved his arms until she was afraid of him, and she told him that, if he did not stop, she would leave. A neighbor woman testifies that she helped plaintiff when plaintiff had typhoid; that there was no nurse. On cross-examination, she says she never heard defendant abuse his wife, but that he was hardly ever there when witness was. As said, plaintiff is corroborated by her son and his wife, as to defendant's abuse. On the other hand, a young girl 14 years of age, testifying for defendant, says that she lived in the Anderson home three months, and that, at that time, plaintiff's health was not poor, that she knows of; that she was up and around, doing the housework, or helping; that she never heard defendant use any vile or profane language towards plaintiff. or mistreat her; but, as we understand the record, this was in September, 1917, before the alleged change in defendant's conduct. Two or three neighbors, testifying for defendant, say that they never heard defendant abuse her; but one of these testifies that he never was there when plaintiff and defendant were both present. Some of these were there more frequently.

Plaintiff says that defendant did not abuse her as much in the presence of neighbors and others. One of defendant's witnesses testifies that, while he never heard defendant curse his wife, defendant sometimes used blasphemous language in talking with witness. Another witness testified that defendant used profane language in conversation, but thinks it was more of a habit than anything else. Defendant denies much of plaintiff's testimony, and denies mistreating her by cursing, and says that he never objected to her having medical treatment. He introduced two or three letters received from plaintiff while she was in California, in which she expresses more or less affection for him. As to the effect upon plaintiff's health, plaintiff testifies that her health is very poor, and says it is the result of defendant's abuse; that she has been advised by different doctors to have an operation for hernia, but hasn't the money to pay for it; that she is only able to be on her feet for a short time, and that the hernia is very painful all the time; that she has never entirely recovered the strength she had prior to the operation. The daughter-in-law testifies that plaintiff's health, since she has been living with them, has been very poor; that she has been sick in bed at two different times, for a week at a time. The doctor testifies that, since the operation at the hospital, plaintiff has developed umbilical hernia, at the point where the incision was made for the operation, which condition still existed at the time of the trial; that she will have to be operated on; that she is nervous, and will suffer more or less pain constantly; that he saw her, a short time before the trial; that she was then extremely nervous; that she is in poor physical condition, on account of the hernia and extreme nervousness; that worry, with physical illness, produces such a condition of nervousness; that her domestic troubles for the period of six months would certainly produce a nervous condition, under some circumstances; that this does not mean that the nervous condition was due to the hernia. Doubtless, plaintiff has exaggerated somewhat in her testimony, and doubtless, defendant has shaded his testimony in his own

favor. We are convinced, from the record, that defendant has mistreated plaintiff to some extent, by cursing her and swearing at her. Up to this point, it may be that the evidence should not be held sufficient to justify a divorce; and yet, considering the state of her health, it is, to say the least, very close.

2.   There is, however, in addition to the foregoing, another circumstance that is not and cannot be disputed. The defendant filed a cross-petition, asking for a divorce from plaintiff on the ground of cruelty, setting out a number of circumstances of alleged misconduct on her part; among them, charging her with desertion; and charging that plaintiff has feigned illness at various times, and that she would lie in bed mornings, and that defendant was compelled to prepare his meals, and that, when defendant had gone to his work, plaintiff would arise, and spend the day on the streets and elsewhere; that, without defendant's consent, she went to California, under the pretext that she was ill; and charging that she had been guilty of adultery, with persons to him unknown. This cross-petition was dismissed at the close of the defendant's evidence, but it was dismissed without prejudice. There was no retraction of the charge by defendant. On cross-examination, he testified:.

"I don't know of anybody with whom she has committed adultery. I do not know whether she has committed adultery with anybody or not, but I am willing to live with her. I do not know whether I accused her of it or not. I charged her with adultery with persons whose names are unknown to me. I don't want to hurt her feelings, or her standing. I think it would hurt her standing to have a thing of that kind put in the paper. If she would come back and live with me, I would treat her as well as I have treated her, in spite of the allegations in the cross-petition."

Defendant, at the time he so testified, was confronted with the fact that he had charged her with adultery, in his pleading. He does not testify that he will treat her properly, if she will live with him, but that he will treat her as well as he ever did. Under all the circumstances, there may

be some doubt as to whether his testimony on this point was given with entire good faith. Whether the false accusations of infidelity endanger the life of one so treated, must be determined from the attending circumstances, but such accusations are acts of cruel and inhuman treatment. *Blair v. Blair,* 106 Iowa 269. Whether the accusation by defendant in his cross-petition is, of itself, sufficient to justify a divorce, we need not determine; but, in connection with all the other circumstances in the case, we think plaintiff has made out a case for divorce. It is contended by appellant that, where the charge is made in a pleading without reasonable cause, malice will be presumed, and that such an allegation is wanton. We shall not review appellant's cases. They cite, at this point, *Coulthard v. Coulthard,* 91 Iowa 742; *Haight v. Haight,* (Iowa) 82 N. W. 443 (not officially reported); *Turner v. Turner,* 122 Iowa 113; *Shors v. Shors,* 133 Iowa 22; *Rader v. Rader,* 136 Iowa 223; *Pooley v. Pooley,* 178 Iowa 19; 14 Cyc. 606; 1 Bishop on Marriage, Divorce, and Separation (1891 Ed.), Section 1570; *Myrick v. Myrick,* 67 Ga. 771, 782, 783; *Avery v. Avery,* 33 Kan. 1; *Smith v. Smith,* 8 Ore. 100; *Williams v. Williams,* 67 Tex. 198; *Jones v. Jones,* 60 Tex. 451, 460; *Powelson v. Powelson,* 22 Cal. 358; *Rodgers v. Rodgers,* (Ky.) 17 S. W. 573; *Palmer v. Palmer,* 45 Mich. 150 (7 N. W. 350).

Appellee cites a number of authorities on the general proposition that, under the evidence, plaintiff is not entitled to a divorce, and on the question of the charge of adultery cites *Evans v. Evans,* 82 Iowa 462; *Felton v. Felton,* 94 Iowa 739; *Haight v. Haight,* (Iowa) 82 N. W. 443 (not officially reported); *Blair v. Blair,* 106 Iowa 269; *Young v. Young,* 173 Iowa 424. In the *Evans* case, it was held that the wife had so conducted herself toward other men as to provoke the language used by the husband. There is no evidence of that kind in the instant case. In the *Felton* case, there was a dispute in the testimony as to whether the husband had accused his wife of being unchaste. Such is not the situation here. In the *Haight* case, it was held that frequent and false public charges of this kind, where plaintiff

was in ill health, constitute legal cruelty. In the instant case, there were not frequent charges, but the charge was in a written pleading, a public record. In the *Young* case, the evidence was in dispute as to whether the charges were made.

3. Defendant testified that, at the time of the trial, his average daily wage for the last year was $6.50, and that he had steady employment. She gives it at $7.00 a day. At the time of the marriage, defendant

2. DIVORCE: alimony: division of property. had a small amount of money, $50 or $60, and owned a cottage in the city, which she says he had been offering at $2,800 or $3,000, which was traded for the acreage property and $900. She says that, at that time, the acreage was all in a corn field, with no house, and that they valued it at $2,500. He puts these figures somewhat higher. She testifies that, when they moved onto the acreage, they lived in a barn, and that they built a hog house, cave, chicken house, and a small shack of a house, where they lived for three years; and that then they built the house which is now there, which cost about $3,000. She earned some money, selling milk, cream, butter, and vegetables, and at different times worked for the city railroad company, and received about $75 for that work. She says she put $1,800 or more into the acreage property, and is corroborated by another witness as to having a considerable sum of money in the bank, which defendant says he never heard of. They own some live stock, a cow, chickens, etc. The amount and value of the personal property is not very definitely shown in the record. The petition alleges that it is of the value of $1,000. There seems to be at least one Liberty Bond, referred to incidentally, which we understand to be in plaintiff's possession. The value of the acreage property is given by plaintiff at $9,000; and others of plaintiff's witnesses, who seem to be disinterested, fix the value at $8,000 or $9,000. Defendant's estimate is $6,000, and his other witnesses give it at about that. Somewhere between these two probably is the real value. Under the circumstances, it is somewhat difficult to

determine just what would be an equitable adjustment of alimony and the property rights. In her original petition, plaintiff asked for $500 permanent alimony, and that she be decreéd to be the owner of the real estate, and for attorneys' fees. By an amendment, she asks $2,000 and the property.

Our conclusion is that the property is of the fair and reasonable value of $8,000, and that the defendant should be decreed such property, and that the plaintiff should be allowed the sum of $3,500, established as a lien against said property, payable as follows: $200 within 10 days from the filing of this opinion, and the remaining $3,300 within 60 days thereof; that the plaintiff have all the household goods purchased by her; and that the defendant pay $100 to plaintiff's attorneys, as fees in this case; and that a decree of divorce be entered. The decree is reversed accordingly, and the cause remanded to the district court for the entry of a decree in harmony with this opinion.—*Reversed.*

LADD, C. J., GAYNOR and STEVENS, JJ., concur.