ADELE L. MASSIE, Appellee, v. JOHN C. MASSIE, Appellant.

**DIVORCE: Grounds—Cruelty—Unwarranted Charges and Threats.** Un-
1  warranted charges of unchastity and violent threats may constitute such cruel and inhuman treatment as to justify a decree of divorce, provided they endanger the life of complainant.

**DIVORCE: Condonation—Breach of Condition—Effect.** Condonation is
2  always conditional upon the fact that the party forgiven will thereafter abstain from the commission of offenses similar to those forgiven. (See Book of Anno., Vol. 1, Sec. 10475, Anno. 106 *et seq.*)

Headnote 1:  19 C. J. pp. 48, 51.  Headnote 2:  19 C. J. pp. 83, 84, 85.

Headnote 1:  18 L. R. A. (N. S.) 300; 34 L. R. A. (N. S.) 360; 9 R. C. L. 346.  Headnote 2:  9 R. C. L. 384.

*Appeal from Wapello District Court.*—F. M. HUNTER, Judge.

OCTOBER 19, 1926.

REHEARING DENIED JANUARY 22, 1927.

Action for a divorce on the ground of cruel and inhuman treatment. The district court awarded plaintiff a divorce on the grounds alleged, and defendant appeals.—*Affirmed.*

*Jaques, Tisdale & Jaques* and *L. L. Duke,* for appellant.

*Jones & White,* for appellee.

ALBERT, J.—There are some underlying principles in cases of this kind which have been well settled by this court. We have said that there may be cruel and inhuman treatment such

1. DIVORCE: grounds: cruelty: unwarranted charges and threats.

as to endanger life, without any physical violence. *Doolittle v. Doolittle*, 78 Iowa 691; *Hullinger v. Hullinger*, 133 Iowa 269; *Rader v. Rader*, 136 Iowa 223; *Hickman v. Hickman*, 188 Iowa 697; *Anderson v. Anderson*, 189 Iowa 95; *Dabelstein v. Dabelstein*, 191 Iowa 808; *Inman v. Inman*, 196 Iowa 845. Also, that unwarranted charges and accusations of unchastity constitute cruel and inhuman treatment, and are sufficient to justify the granting of a divorce. *Turner v. Turner*, 122 Iowa 113; *Martin v. Martin*, 150 Iowa 223; *Butts v. Butts*, 185 Iowa 954; *Meyer v. Meyer*, 187 Iowa 617; *Anderson v. Anderson*, supra; *Shaffer v. Shaffer* (Iowa), 181 N. W. 261 (not officially reported). Also, that the use of violent threats toward a cultured, refined woman of frail health is treatment sufficiently cruel and inhuman to endanger her life and warrant granting of a divorce. *Wheeler v. Wheeler*, 53 Iowa 511; *Douglass v. Douglass*, 81 Iowa 258; *Shook v. Shook*, 114 Iowa 592; *Berry v. Berry*, 115 Iowa 543.

In cases of this kind, although they are in equity, and triable *de novo* here, in the presence of a serious conflict in the testimony, we are disposed to give serious consideration to the decision of the trial court, in determining final disposition of the case here. *Berry v. Berry*, supra; *Rader v. Rader*, supra; *Pooley v. Pooley*, 178 Iowa 19; *Lewis v. Lewis*, 197 Iowa 703; *Rust v. Trapp* (Iowa), 201 N. W. 565 (not officially reported).

We have also held that, in actions of this kind, the two elements are of equal importance, to wit, cruel and inhuman treatment, which must be of such a character as to endanger the life of the applicant. *Hill v. Hill*, 201 Iowa 864.

It is equally true that the burden of proof is on the plaintiff to establish her claim herein by a preponderance of the evidence. Harm might be done to the parties and little good would come to the profession by a detailed recitation of the facts established in this case. Sixteen days were taken in the trial of the case, and the abstract and amendments presented to us consist of something over 650 pages.

Each action of this kind must rest wholly on the particular

facts developed under the evidence in the case, and in such matters precedents are of little value. We will not attempt to summarize this record thoroughly, but in a sketchy way refer to some of the high points in the testimony.

Plaintiff and defendant, in their youthful days, resided in the same town in Illinois, became acquainted, and kept company for some time, and probably each was, to a certain extent, infatuated with the other; but the defendant moved from this Illinois town, and the romance did not materialize. Later, the plaintiff married a man by the name of Harding, and, after living with him for a short time, divorced him, and later married one Wallace by name, and went to St. Paul to live. They were married for 17 years, and, under the recited facts, she was warranted in leaving him when she did. He gave her money and securities to the amount of $50,000, and she moved to California. He later obtained a divorce from her by default, on the ground of desertion. Plaintiff and defendant had met but two or three times while she was the wife of Harding and of Wallace. Defendant, according to his story, was in love with this woman ever since he first met her. He never married, and he attempted on several occasions to keep track of her. In the summer of 1921, some correspondence and telegrams passed between these parties. It is probable, under the evidence, that she made the first advances. By arrangement, they met in Des Moines, where he was then living. They met, the old flame of romance was fanned, and resulted in their marriage, a few days later. The defendant was an employee of the Federal government, and drew a salary of something like $1,740 a year and expenses. Up to this time, he had practically not accumulated anything. He had a few hundred dollars in the bank, which he says he spent for the honeymoon trip. On the other hand, she says she paid the expenses of this trip. They took apartments in Des Moines, bought furniture on the installment plan, and started housekeeping. A bank account was opened in one of the city banks in her name. Whatever funds the plaintiff had on hand, together with his monthly pay checks as they came in from the government, were deposited in this bank account. She drew all the checks on the account, and, when necessary, furnished him bank checks signed by her, to the end that he might draw funds from said account. There seems to have been no rift in

their happiness during their stay in Des Moines. She had one operation while she was in Des Moines, and was in the hospital several days. She had had two or three operations in years previous, and seems to have been a woman of rather delicate health. The evidence quite satisfactorily shows that she was a woman of refinement and culture, and had, during most of the years of her life, been associated with high-class people. He had an aspiration to retire to a farm, and, upon his talking it over with a friend one night in her presence, she suggested that they buy a farm and move onto it. They finally bought a 200-acre farm in Greene Township, Wapello County, Iowa, at a price of $10,000. $1,000 was paid down, on the signing of the contract, which was signed by both parties, $1,000 was paid the 1st of the next March, and the deferred payments of $8,000 were taken care of by a mortgage on the farm. They moved to this farm about March 1, 1922.

At this point, there is a dispute between the parties, the defendant claiming that he had an agreement with his wife that she was to put in her money and he would put in his time in the occupation and carrying on of this farm, and that it was to be a 50-50 proposition: that is, that later, the farm was to be sold, and the profits divided between them, half and half. He further claims that the fact that payments were made on the farm from the bank account, as hereinbefore recited, warranted a conclusion that at least a part of his salary went into the purchase price of said farm. This matter will be given attention later in the opinion. They moved their furniture to the farm, and made improvements thereon. The bank account was transferred to Ottumwa, still continuing in her name, and all checks drawn on the bank account were signed by her. The buildings on the farm were improved, and some new buildings constructed. Shortly after they moved to the farm, having no children, they took a girl, by the name of Florence Bloomfield, from the soldiers' orphans' home at Davenport, and later they also took into their family another orphan, the brother of the girl named above, he being known in the record as Charles Bloomfield. It is at this point that the difficulties arose upon which this action is based, and the record history of their life on the farm contains a recitation of the usual trials and tribulations incident to married life. Disagreements arose between them about

various matters; and the defendant, according to the record, was a man of excitable temperament, and easily angered, and was given, in some instances, to very bitter sarcasm. Some disagreements arose between them as to the children, which resulted later in returning these children to the orphans' home. While it is a disputed question in the record, he flatly denying it, the weight of the evidence shows that, on various occasions, some of them in the presence of the children, he accused this woman of immorality, of being a "whore," and also insisted that "she had nigger blood in her family." On various occasions, he swore at her or in her presence, struck the boy with his fist, and knocked him down; and it would seem that on these occasions he had no control or restraint over himself whatever. She was attempting on one occasion to teach the little girl the Bible story of the resurrection of Christ, and he ridiculed her in her efforts. It is to be said here, in passing, that she was a spiritualist in belief, a fact, however, which he knew before he married her. The outcome of the whole affair was that she advised him that, if he did not desist from this method of treatment of her, she would not live with him. He failed to restrain his conduct and actions, and on December 4, 1922, the matter culminated in another difficulty between them. She then finally determined to leave him, which she did a few days later.

The evidence shows that, after these difficulties, on some occasions she was unable to eat, and frequently was driven to tears. She left the farm and went to Ottumwa, where she stayed at the Frasier Hotel for some time, and later went to Chicago. After she went to Chicago, she was still suffering from her physical disabilities, and was under a doctor's care for quite a length of time. She recuperated, however, but seems always to have been a rather frail woman, weakened from operations; and in fact the evidence in the case shows that, at the time of the trial of the case, she was then in such a condition that she would have to undergo a major operation.

At the time she went to Chicago, an arrangement was made between them by which he was to have charge of the farm, and pay interest, taxes, etc., out of the proceeds. He was successful in obtaining employment with the government, and was later transferred to California.

At this point there was introduced in the case a large num-

ber of letters written by her to him. She says that, on their final separation, there was a feeling on his part that their difficulties might be adjusted, and that he requested her to write letters to him of the character hereinbefore referred to, and that she felt in duty bound to see if it were not possible to forget the past and reconcile herself to the situation, to the end that they might eventually resume the family relations. These letters were all before the court, and contained the usual expressions of love and affection that would be expected between man and wife where no difficulties exist. Later, he wrote her that he would be in Ottumwa on a certain date, and asked her to meet him there, that they might talk over their matters. In pursuance thereof, he reached Ottumwa first, took a room at the hotel, and met her at the train. They went to the hotel, and she took a room by herself. This was on Sunday, and she remained there until the Thursday following, when she went back to Chicago, and he left for Omaha the following Sunday. There is a very sharp conflict in the evidence at this point as to just

2. DIVORCE: condonation: breach of condition: effect.

what occurred between them. The defense claims that there was a complete reconciliation and condonation. The appellee claims that this is not true; that the final outcome of this conference was that she agreed that, if she could in the future reach the satisfactory conclusion that she could forgive him for the offenses of the past and that she was satisfied that they could live happily together, then she would resume the marital relations with him. In other words, she says that the reconciliation was only conditional. He insists that there was a complete condonation effected at the time, and that the full marital relation was re-established between them, while they were at the hotel in Ottumwa. She denies this positively. On a plea of condonation, the burden of proof is on the person asserting the condonation. *Sesterhen v. Sesterhen*, 60 Iowa 301; 19 Corpus Juris 115, 127; 9 Ruling Case Law 386.

More than this, there cannot be a condonation unless the reconciliation be complete, and an agreement then made to continue to live together as husband and wife, followed by a carrying out of this agreement and a restoration of marital rights and privileges, including cohabitation. *Cochran v. Cochran*, 35 Iowa 477; *Harnett v. Harnett*, 59 Iowa 401; *Davison v. Davison*,

182 Iowa 1116. In the case of *Hickman v. Hickman*, 188 Iowa 697, in discussion of this question, we said:

"The defendant pleads condonation. This.plea is predicated upon the alleged fact that the parties cohabited, after the alleged cruelty. But cohabitation is not necessarily a condonation of cruel treatment, and this is especially so as to the wife. As the weaker vessel, and as the victim of such cruel treatment, she is often to be deemed as under some degree of duress. Her moral freedom of action is to be considered, on a plea of her condonation. Condonation, if proved, implies the condition that kindness shall supplant the cruelty complained of. Subsequent conjugal unkindness will avoid condonation, even though such unkindness be less than extreme cruelty, and be insufficient, of itself, as a ground of divorce."

This being the law of this state governing condonation, and the burden of proof being on the husband to establish his plea of condonation, we conclude that he has not carried his burden, and therefore his plea of condonation was properly rejected by the district court.

After the meeting in Ottumwa, the evidence shows, the woman at this time was apparently in good faith attempting to forget the past and to place herself in such a state of mind that she could re-establish a home with her husband. She says that the letters she received from him were very pleasant and satisfactory, but that later he became very disagreeable in his letters and very sarcastic; that she finally gave up all hopes of resuming the marital relations. Shortly after their separation, she started this divorce action. After their conference at Ottumwa, in her then hopeful condition, she told the defendant that she would dismiss this divorce action; but this was never done. The action was finally taken up, was tried, and resulted as above specified.

This is a hasty review of the voluminous record in this case. Much that weighs one way or the other in the case is not referred to in this opinion; but, after having read and studied this record carefully, we are contented with the decision of the lower court. While the case is triable *de novo* here, at the same time the general demeanor, appearance, and conduct of these parties and their witnesses are quite an important factor in reaching a just conclusion. We have not this advantage.

The decree below granted the divorce to plaintiff, and, as

. between her and appellant, provided that, as to the liability on the mortgage, which they both signed, her liability should be primary, and his secondary only.

Appellant was given judgment against appellee for $430, with 6 per cent interest for money advanced by him to her since the date of their separation. This, we think, is correct. Appellant seems to be dissatisfied therewith because he feels that he should have something out of the farm; but we find that, under the evidence, the agreement that he claims existed between himself and his wife in relation thereto is not established; and if it were otherwise, in view of the vastly depreciated price of land in Iowa, we have nothing in the record on which we could base an allowance.—*Affirmed.*

De Graff, C. J., and Evans and Morling, JJ., concur.