BERNARD KLEINENDORST, appellant, v. HAZEL MARIE KLEINEN-DORST, appellee and cross-petitioner.

No. 50424.

MAY 8, 1962.

Life, Davis & Life, of Oskaloosa, for appellant.

A. Dale Swanson, of Newton, for appellee and cross-petitioner.

PETERSON, J.—Plaintiff and defendant were married at Newton on July 16, 1950. They are the parents of two children, Deborah Sue, born October 11, 1952, and Perry Neal, born July 4, 1959. The parties lived together at a home which they had jointly purchased until January 19, 1960. On that date plaintiff started a divorce action against defendant on the ground of cruel and inhuman treatment. The next day he moved to a motel in Newton. Defendant filed answer to the divorce petition, denying plaintiff's charges, and filed petition for separate maintenance on the ground of cruel and inhuman treatment. The case was tried in April of 1961. The trial court held plaintiff had not sustained his allegations as to cruel and inhuman treatment and dismissed his petition. The court also held defendant had sustained her case for separate maintenance, on the basis of cruel and inhuman treatment, and granted decree in her favor. The court also granted defendant custody of the two children and some support money. Plaintiff has appealed.

We have often said that a divorce case, and the same

would be true with reference to a separate-maintenance case, depends upon the peculiar and specific facts of the case under consideration. No two cases are exactly alike. This is particularly true as to the case at bar. There are some facts in the case which are new, although many facts are controlled by general and well established principles.

A suit for separate maintenance is not established by statute in Iowa. It is maintained under the general equity powers of the courts, and certain rules and principles have been announced throughout the years. The question of separate-maintenance procedure was first determined in this court in Graves v. Graves, 36 Iowa 310, 14 Am. Rep. 525.

Usually only support money in favor of a wife and children, if she secures a decree, is established in a separate-maintenance suit, although under certain conditions lump sum settlements have been fixed by the court. Schultz v. Brewer, 245 Iowa 240, 61 N.W.2d 446; Avery v. Avery, 236 Iowa 9, 14, 17 N.W.2d 820, 823; 42 C. J. S., Husband and Wife, section 623.

In the case at bar the trial court did not establish any lump sum and final settlement as to the property of the parties. The court made provision for payment by plaintiff of certain payments for home obligations, and payment of $25 per week toward the support and care of defendant and the two children. The court provided that defendant and the children should be permitted to occupy the home of the parties and provided for payment by defendant of a certain obligation with reference to a newly built breezeway. In 1960 plaintiff earned approximately $6000. He held an extra job for many years as custodian of a church and earned $480 a year. He has discontinued such work, so his earnings now are approximately $5500 per year. Defendant earns approximately $160 per month in take-home pay.

I. We will first consider the divorce petition of plaintiff, and the question of his establishment of the alleged ground of cruel and inhuman treatment. This is plaintiff's second marriage; he was divorced from his first wife. In general the charges made by plaintiff against defendant are: 1. Continuous nagging. 2. Poor housekeeper. 3. She admitted to him that prior to marriage she had sexual relations with six men.

4. He alleges she had improper relations with another unnamed man, and with his brother. He also alleges he is not the father of Perry Neal. 5. He claimed defendant was cruel in scratching his back until it bled, and in kicking him on two occasions.

Each party testified fully as to their respective complaints. As usual in cases of this type the testimony is contradictory. The case, of course, is triable de novo and we have given careful consideration to the stories of the two parties. Some questions are difficult to evaluate from the printed page. For that reason we say in a case of this type we give considerable weight to the findings of fact of the trial court. That court has the advantage of observing the demeanor and actions of the parties, and their witnesses.

It must be remembered that the statute requires two ingredients in cruel treatment to constitute ground for divorce: 1. It must be inhuman. 2. It must endanger life. Freerking v. Freerking, 19 Iowa 34. Such treatment, however, does not necessarily involve physical violence. Wallace v. Wallace, 212 Iowa 190, 235 N.W. 728; Siverson v. Siverson, 217 Iowa 1167, 251 N.W. 653; Neff v. Neff, 237 Iowa 69, 20 N.W.2d 916.

A careful analysis of the testimony of the two parties does not establish what plaintiff calls "nagging". It does establish that they had many violent quarrels and discussions. If anything, plaintiff was a more vigorous party as to such quarrels than defendant.

Plaintiff emphasized the housekeeping matter, even to the extent of coming to the house, after he moved out and when defendant was not home and taking photographs of various rooms in the house, which photographs are in evidence. There was some disorder at times; perhaps there is at times in every home.

Defendant had some reason for some disorder, especially after plaintiff left the home, because it was necessary that she work in order to assist in caring for her children and herself. She was away from the house from 7:30 in the morning until between five and six o'clock in the evening. She had a baby-sitter to take care of the children when she was not there, but she could not expect much housework from a baby-sitter. When he was at home plaintiff did not contribute much to the house-

hold situation. He would lie down on the lounge and would then order defendant to bring him what he wanted such as a sandwich, coffee, orange juice, etc. One time she was a little slow in complying with his request, and his remark was: "Okay, old gal, if you don't get in here I am going to come in there and beat hell out of you."

Leona Klouda, plaintiff's sister, testified for defendant in part as follows: "I have never observed Hazel nagging Bob any more than I would with my husband. * * * I think Hazel is a normal housekeeper. She makes a very good mother."

Defendant explains the matter of his charge against her that she admitted having improper relations with other men prior to their marriage. She states that for several months, about a year or two after the marriage, he continuously asked her if anything of such nature had occurred in her life prior to the marriage. The cross-examination became so annoying to her that she finally decided she would tell him that she had such improper relations with six men. No one was named. She explains it was only a fabrication on her part in an attempt to stop the annoyance. She said it seemed to work, because thereafter he did not annoy her as to that question.

The testimony discloses that at one time he and his brother Lester (commonly known as Bud) had a violent discussion in the home. It had to do with plaintiff's treatment of defendant. There was some discussion as to Bud "cleaning up on plaintiff" but he never did.

This is the situation which finally, at least partially, led to the accusation by plaintiff as to the paternity of the little boy, Perry. He declared defendant had a secret admirer, but he also discussed and charged his brother with such paternity.

As to the occurrence when defendant scratched plaintiff's back she explained in her testimony that plaintiff had paddled her; that she was only dressed in a nightgown and she tried to defend herself by scratching his back. She admitted she had given him a kick, in the proper spot, when he broke a door to get into her room.

The most serious charge concerned the paternity of Perry. It was vigorously denied by defendant and by plaintiff's brother Lester, who was happily married.

Plaintiff, in his own testimony, answered the question himself. His attorney asked him:

"Q. From the time seven months prior to the birth of this boy, back to the time eleven months prior to the birth of this child, in that period of four months you may state what the fact is as to whether or not you had sexual relations with your wife. A. That was a long time to remember, but I think once during that period."

The record does not disclose by a preponderance of the evidence any situation of extreme cruelty to plaintiff. We also doubt if it affected his health. It is true he testified as to the loss of some weight, but the record discloses without conflict that he worked regularly at a very good position and for some years he bowled every night and stayed out until two to four o'clock in the morning. No evidence appears as to any illness of any kind except plaintiff claims he had migraine headaches at times. However, the record shows he had these long before he was married to defendant. We hold the trial court was correct in dismissing plaintiff's petition.

II. In her cross-petition, and in the evidence shown in the record in support of such cross-petition, defendant alleges cruel and inhuman treatment as the basis for decree of separate maintenance. The details submitted are as follows: 1. Plaintiff twisted her arm, forcing her to kneel on the floor. 2. Plaintiff paddled her hard when she was only dressed in her nightgown and on one occasion at least paddled her with a hairbrush. 3. For some years prior to 1960 plaintiff bowled every night. He had as his bowling companion a lady by the name of Dorothy Schultz. He would regularly come home from two to four o'clock in the morning and would always awaken defendant, and many times the children, causing defendant to lose many hours of sleep and sometimes to become so weak from such actions that she was not able to go to her work the next day. 4. Plaintiff had a romantic affair with Dorothy Schultz leading to his declaration that he wanted her (presumably as his next wife). 5. Plaintiff declared and alleged, without any basis therefor, that defendant had improper relations with plaintiff's brother Lester (usually known as Bud). 6. Plaintiff, without any basis, alleged that defendant had a clandestine affair with another man

whose name he did not know. 7. Plaintiff declared to defendant and to other parties, without any basis therefor, that he was not the father of their little boy, Perry Neal, born on July 4, 1959.

Defendant testified, and plaintiff admitted in his testimony, that he had paddled his wife ("good and hard" as plaintiff stated). On one occasion he used a hairbrush in said paddling. The hairbrush is in evidence, broken in two parts. It was not broken during the paddling process, but plaintiff broke the brush in a fit of anger immediately thereafter. This was physical violence.

On occasions plaintiff twisted defendant's arm so hard that she was forced to kneel on the floor in front of him and he would then laugh at her when in such position. This was embarrassing and also physical violence.

Some years before plaintiff left his home in 1960, he joined what was known as a bowling team. His companion bowler was a single lady by the name of Dorothy Schultz. In the course of time a romantic attachment developed between plaintiff and Dorothy. One witness testified he saw the two together in a car parked in an alley late one night, after the bowling game was over. Plaintiff stated in his testimony that he never telephoned Dorothy nor had any correspondence with her. The evidence on behalf of defendant is to the contrary.

One witness who appeared for defendant testified she roomed with Dorothy and that plaintiff often telephoned her. Defendant found three letters from Dorothy to plaintiff in the glove compartment of his car. They were all addressed to "Dear Bob" and were signed "Love, Dot". Defendant took one of the letters, and it was offered in evidence as Exhibit 1. It appears in full in the record and occupies more than seven pages. Much of the letter is composed of normal statements as to how Dorothy spent her time from day-to-day. However, she made two statements which are illuminating. She said: "I was surprised to get a letter from you during the week. I will be glad when we don't have to write anymore." Her final paragraph was: "P.S. Just because I am going with Dwight please don't give up on me and please don't be mad if I go with him more than once because it is you who I am interested in."

Two of plaintiff's sisters came to the bowling alley one evening to have a discussion with Dorothy and to urge her not to break up the family of their brother Bob, and defendant, Hazel. They apparently did not receive a satisfactory response from Dorothy. Mr. Ben Klouda was a brother-in-law of plaintiff, having married his sister Leona. Both Leona and Ben testified on behalf of defendant. Ben was present at the conversation in the bowling alley and testified as follows: "That was when the girls [two sisters of plaintiff] were trying to talk Dorothy into letting up on this going bowling with him, and then, of course, the conversation went on to the point that Bob made the remark pretty loud, loud enough so that he could be heard quite a distance, past me at least, if he couldn't have Dorothy he would get somebody else. He referred to getting someone out of a beer joint." Plaintiff declares he referred to bowling partner only, but his two sisters and brother-in-law state otherwise.

Plaintiff alleged in the amendment to his petition, and contended in the testimony, that defendant had an improper clandestine affair with a man he could not name. Plaintiff also alleged that defendant had improper relations with his brother Lester, and that he was not the father of the little boy, Perry. Plaintiff even carried his charge with reference to the little boy to the extent that he wanted to have a blood test taken of himself and the boy. Defendant's indignant answer to this suggestion was "Don't be silly!". After plaintiff's sisters went to the bowling alley to try to save his marriage, plaintiff demanded a divorce from defendant; she said "No".

Defendant positively denied any improper relations with plaintiff's brother or with any other man. She also testified that plaintiff was positively the father of the little boy, Perry; that while they had occupied separate bedrooms for two or three years she regularly had intercourse with plaintiff extending back more than a year before the birth of Perry. Plaintiff's brother Lester also indignantly denied that he had any improper relations with defendant. He testified he was a happily married man with a fine wife, family and home.

On this question defendant testified: "I think I know my husband. I say he is not telling the truth when he said he didn't

1032

know me sexually more than two or possibly at the outside three times during the two years prior to the birth of my [last] child."

■ False charges of conjugal misconduct constitute cruel and inhuman treatment and are a basis for divorce or decree of separate maintenance. Massie v. Massie, 202 Iowa 1311, 210 N.W. 431; Williges v. Williges, 215 Iowa 960, 247 N.W. 222; Anderson v. Anderson, 189 Iowa 95, 174 N.W. 665; Turner v. Turner, 122 Iowa 113, 97 N.W. 997.

One unique and unusual situation appears in the record in this case. We feel the trial court took the matter into consideration in its decision, and properly so. While one niece, one sister-in-law and one sister testified for plaintiff, there were two sisters, one brother and one brother-in-law of plaintiff's who testified on behalf of defendant.

In its decision the trial court cited and placed some weight on the case of Smith v. Smith, 172 Iowa 329, 334, 335, 151 N.W. 1085. The case is not identical, but it has some similarities which justified the court in citing it on behalf of defendant. In the Smith case, the wife sued her husband for separate maintenance, which was denied by the trial court. In the decision for the court, Judge Evans analyzed the evidence and held that a decree of separate maintenance should be granted to plaintiff. Judge Evans stated there was some blame on both sides, but that defendant was largely to blame. On that theory he granted separate maintenance to plaintiff, stating:

"We infer that the trial judge denied her relief because he deemed her partly to blame. The result thus reached, however, is something less than justice. The greater blame is clearly upon the defendant. The greatest obstacle in the way of reconciliation is the attitude of the defendant, imputing infidelity to his wife. Assuming her to be innocent, as we must upon this record, no greater cruelty could be perpetrated upon her than these imputations. It is idle for him to testify to his willingness to live with her while professing convictions of this kind. * * * Notwithstanding that the plaintiff has not been wholly free from fault in many of the controversies, this is not sufficient to justify or excuse the major blame which rests upon the defendant, and which makes the separate maintenance for the time being at least a necessity."

It is significant that outside of plaintiff's charges and innuendos against defendant, he was unable to produce any witness or witnesses sustaining his claims as to defendant's character or morality.

Defendant has proven her case by a preponderance of the evidence, and the decision of the trial court granting her a decree of separate maintenance is affirmed.—Affirmed.

All JUSTICES concur except MOORE, J., who takes no part.