Lauretta M. Cimijotti, appellee, v. Eberhard F. Cimijotti, appellant.

No. 50959.

(Reported in 121 N.W.2d 537)

MAY 7, 1963.

Floyd Ensign, of Northwood, and Nichols & Gillard, of Albert Lea, Minnesota, for appellant.

Beck & Butler, of Mason City, for appellee.

STUART, J.—Plaintiff instituted this action for divorce against her husband on the ground of cruel and inhuman treatment. The trial court granted a divorce and made a property division in lieu of periodic alimony payments. The defendant has appealed setting forth four propositions upon which he relies for reversal. (1) The evidence fails to establish the defendant's conduct was (a) inhuman and that (b) plaintiff's life was endangered. (2) Evidence of sexual abuse consists only of uncorroborated statements of plaintiff and does not meet the requirements of law. (3) Plaintiff's testimony is uncorroborated except for hearsay testimony. (4) The division of the property was grossly inequitable. We shall discuss these propositions in order.

■■■ I. The burden is upon the plaintiff to prove defendant's conduct toward her was cruel and inhuman and that her life was thereby endangered. There are many courses of conduct other than outright physical violence which have been held by this court to satisfy these requirements. Any mistreatment which deprives the person of needed rest and peace of mind and affects the nervous system and bodily functions to the extent that the health is undermined, endangers the life as effectively as physical violence. Littleton v. Littleton, 233 Iowa 1020, 10 N.W.2d 57; Coulter v. Coulter, 204 Iowa 575, 215 N.W. 619; Murray v. Murray, 244 Iowa 548, 57 N.W.2d 234; Brown v. Brown, 248 Iowa 802, 82 N.W.2d 661; Low v. Low, 232 Iowa 1114, 7 N.W.2d 367. These include false charges of conjugal misconduct, Levis v. Levis, 243 Iowa 574, 52 N.W.2d 509; Massie v. Massie, 202 Iowa 1311, 210 N.W. 431; Kleinendorst v. Kleinendorst, 253 Iowa 1024, 115 N.W.2d 155; excessive sexual demands, Veeder v. Veeder, 189 Iowa 912, 179 N.W. 136; Hines v. Hines, 192 Iowa 569, 185 N.W. 91; and threats of physical violence from which one may reasonably fear there is danger, Lane v. Lane, 253 Iowa 92, 111 N.W.2d 286; Payton v. Payton, 252 Iowa 772, 108 N.W.2d 358; all of which are elements appearing in the instant case.

■■■ In matters of this nature, so much depends upon the credibility of the witnesses and their attitude, appearance and demeanor upon the witness stand that we give considerable weight to the decision of the trial court who had the opportunity to observe them testify.

■■■ The parties were married in 1929. They reared two boys, both of whom are of age and are supporting families of their own. The plaintiff has worked most of the time since her marriage with the defendant and her income has been contributed toward family living expenses. Although there is no suggestion in the record that defendant is lazy, his contribution to the family income has been considerably less consistent and reliable than that of the plaintiff. The parties separated three times in a little more than a year including the final separation. At the time of the trial plaintiff was 52 years old and defendant was 56 years old.

According to the plaintiff, the problems which culminated in this action for divorce started in about 1956 and seemed to be primarily the result of the tyrannical and suspicious character of the defendant and his excessive sexual demands. He repeatedly accused her, falsely, of running around with other men, frequenting bars and renting an apartment in town for purposes of prostitution. He was so suspicious that he would not let her leave for work until 15 minutes before time for her to report and required her to be home by 5:30. He insisted that she come home during the noon hour and fix him a hot lunch. He complained of her housekeeping and cooking. He "cussed and swore" at her. He insisted on sexual relations just about every night regardless of plaintiff's wishes. She was afraid of him.

Plaintiff did not testify in detail concerning the effect of this course of conduct upon her health. More positive evidence is found in the testimony of her corroborating witnesses which will be discussed in a subsequent division. She does state, however, that she began consulting a doctor for her nerves in the mid-fifties. She was a physical wreck when she separated from her husband for the first time. She spent most of the three days she was away from him in bed. She testified: "I have just been under a terrific strain. My health has been much better since I left my husband. I have seen the doctor once, I think."

It would serve no useful purpose to set forth plaintiff's testimony in greater detail. Her testimony, if sufficiently corroborated, furnishes support for a decree of divorce on the grounds of cruel and inhuman treatment.

II. Defendant argues, separately, the lack of corroboration of plaintiff's claims of sexual excess and abuses. Such conduct, if proven, can be cruel and inhuman treatment. However, the very nature of the charge is such that it is difficult to corroborate. As stated in Veeder v. Veeder, supra, this difficulty of proof does not relieve the plaintiff of the burden of furnishing corroboration. Plaintiff's testimony need not be corroborated in every detail nor does the evidence have to be enough to support the decree by itself. It is sufficient if it tends to establish the ground relied upon. Bouska v. Bouska, 249 Iowa 281, 284, 86. N.W.2d 884; Payton v. Payton, 252 Iowa 772, 108 N.W.2d 358;

Brown v. Brown, 248 Iowa 802, 82 N.W.2d 661; Low v. Low, 232 Iowa 1114, 7 N.W.2d 367.

Witnesses called for both parties testified plaintiff had told of the excessive sexual demands of her husband. These statements are clearly hearsay. Some of the statements might have been admissible as part of the res gestae when she appeared at her sister's house at 8:30 one morning in a terrible state and told her sister "that was the last time he was going to rape me". No foundation was laid for the admission of the statement and it is not considered as corroboration. Defendant's own witnesses testified without objection to statements made to them by plaintiff regarding sexual abuses. The evidence was based upon plaintiff's statements and we do not look to this testimony for corroboration.

Corroboration may be furnished by the testimony of the defendant. Lane v. Lane, supra; Payton v. Payton, 252 Iowa 772, 108 N.W.2d 358; Bouska v. Bouska, 249 Iowa 281, 86 N.W.2d 884. We believe in this instance the testimony of the defendant supplies sufficient corroboration of the facts to support plaintiff's charge of sexual abuse.

As the trial court noted, defendant assumed a "pietistic attitude" saying "what goes on between man and wife is a sacred thing" and that it was not any different between them than it had been for 30 years. He denied demanding sexual relations every night. However, on cross-examination, he testified as follows:

"Q. You haven't answered my question yet. I asked you whether or not you demanded sexual relations with your wife even though she didn't want them? A. No.

"Q. You never did? A. The way you put it, you can ask, but demanding is a different word.

"Q. Well, if you asked and she said no, what would you do? A. Well, maybe we'd have an argument, maybe we wouldn't.

"Q. Maybe you would have an argument? A. We could have.

"Q. And many times, if not all those times, you had sexual intercourse, is that right? A. It could be."

We hold this testimony on the part of the defendant furnishes adequate corroboration of plaintiff's claim of sexual abuse.

III. We also find sufficient corroboration in the record of plaintiff's other charges of cruel and inhuman treatment. The record contains a great deal of hearsay in which the witnesses repeated what the plaintiff had told them. Plaintiff's witnesses do testify to admissions by defendant that he "cussed and swore" at plaintiff and was later sorry he did it but never told her so. In effect he also admitted threatening her with a gun when asked about the incident by replying that the gun was not loaded. Every witness testified that they observed plaintiff was afraid of her husband. Mrs. Clarice Sprout, a fellow employee, testified they could not get her to run errands at work as her husband would think she was out on the street to attract men and be seen. She also supported the restrictions on plaintiff's time before work.

However, we must again look primarily to the defendant's own testimony to find most of the corroboration of plaintiff's evidence. Although we lack the opportunity of the trial court to observe the witness, an examination of defendant's testimony is more revealing of his character and attitude than in most cases. The impressions received by this court seem to be in harmony with those the trial court disclosed in his decision. The defendant seems to have been callously indifferent, cruelly inconsiderate and completely insensitive to the feelings and desires of his wife. Even at the time of trial he still failed to recognize that he was guilty of any serious fault. He was willing to place the blame on anyone's shoulders but his own. He apparently was so accustomed to having his own way that he felt everything was fine as long as he got his way.

While this is something that one senses from reading the testimony, there are many examples which may serve to illustrate the point.

Defendant states repeatedly that his wife did not complain to him about sexual excesses or keeping her awake at nights, yet as shown by the above quoted testimony he admits repeated arguments with her on the subject which he ended up winning. He apparently did not consider this a complaint, and since he got his way felt that everything was all right.

He testified that his wife's relatives were always welcome in

his house, but on cross-examination he testified: "I told Lauretta she could have anybody up there she wanted, they was welcome. The only thing I didn't like was that I was forced to sit down and help entertain them or eat with them after they treated me the way they did. But·as far as her having them up there * * *." This is a new definition of welcome.

Concerning her charge that he made her come home and fix lunch, he testified:

"I think Lauretta had an hour for lunch during the spring of 1960. I think she had privilege if she wanted to take an hour, hour and a quarter, hour and a half. It didn't make any difference. I said I thought it would be a nice change for her if she would use those lunch hours to come home and fix a hot meal for me. I said I didn't insist that she do that, but I just ask her to do it. I ask her to come home, and I said, Lauretta, why don't you come home, I am up here alone, you have to eat anyhow, and you are sitting in the office all day, you get in the car and drive home and it's a little change. I enjoy—I would appreciate it if she would come home and make lunch for me. We could talk together and it would be a little change. And then she had plenty of time to go back to work. After I ask or suggested or whatever it was, she did come home every noon * * * [until she left except when she had errands]."

On one occasion plaintiff had asked defendant to take her to the fair. While he was waiting for her to dress a Mr. Bob Crim stopped to visit.

"So in the meantime, I was waiting for Lauretta, and we continued talking, and Bob got to the end of the slab and Lauretta came out, and I don't know why she said it, it was either to burn me up or what, but she said should I ride in with Bob Crim. During the whole time I was standing there waiting for her.

"Q. Did she know that you didn't have any particular reason to take her uptown? A. Just to take her to the fair.

"Q. It might have been that it would be a convenience to you, couldn't it? A. To go with Bob Crim?

"Q. Yes. A. Well, Bob Crim was no personal friend of either one of us, just drove in there. I was pretty near a total stranger with him.

84

"Q. Was there any reason why she shouldn't ride in with anybody who wasn't a total stranger? A. Well, do you think it's right?

"Q. I am asking you? A. I don't think it's right, being a man standing there and his wife should crawl in a car with pretty near a total stranger.

"Later that night I did not ask her if he, Bob Crim, had propositioned her. I asked her why she did that to me. I asked her why she wanted to ride with Bob Crim in there when she knew I was standing there waiting for her. She said she didn't think it would hurt."

Plaintiff claims that evening defendant asked if Mr. Crim "propositioned" her and in the ensuing argument he broke dishes all over the floor.

As both parties are members of the Catholic faith, it is apparent their relationship had deteriorated to the place where it was intolerable or a divorce would not have been considered.

Early in their difficulties a priest was consulted. Defendant's reaction was: "It wasn't a meeting of council or trying to straighten anything out; he just all night gave me a raking over the coals. I didn't think it was right. I didn't want my wife abused, and I didn't expect to be abused."

On cross-examination defendant was asked: "Q. Well, I am asking you, did the priest say anything about the treatment, your treatment of Lauretta? A. He could have. I don't to the best of my knowledge, I don't remember."

It is difficult to convey the impression one receives of defendant except by a reading of the record, but we, at least, believe that it displays an attitude and state of mind which corroborates plaintiff's specific instances of wrongful conduct on the part of defendant.

IV. The evidence of the adverse effect upon her health is substantially greater than in many other cases decided in this court in which the evidence was held to be sufficient. Several of her witnesses testified as to her nervous condition and her fear of her husband. Her work was affected. She was a nervous wreck. One sister testified her physical condition was about the same after she separated from her husband and she was better men-

tally even though she still was afraid of him. Mrs. Sprout said her condition improved after her separation, she was happier, more like her old self.

This is an uncommon case in which the effect upon the plaintiff is substantiated by medical evidence. Plaintiff's doctor, C. M. Franchere, testified:

"She consulted me in the latter part of 1959 about her health. I made a complete examination of her at the time. One might put the diagnosis as a matter of nervous exhaustion. Family troubles lead up to nervous exhaustion. I prescribed various sedatives, hormone treatments and tranquilizers.

"The family troubles were definitely adversely affecting her life and health at the time. I treated her through the period from that time on through 1960 and into 1961 when she left her husband. My opinion is the same as to her with respect to all of that period of time.

"Q. Do you feel she was in real fear of her husband? (Objection as calling for opinion and conclusion) A. Definitely, yes.

"At one time when she came to see me, I advised her to consult with a lawyer; I remember that distinctly. That was because I felt that this treatment was adversely affecting her life and health." (Objection)

On cross-examination defendant tried to get the doctor to say plaintiff's condition was a result of the menopause, to which he replied: "A. In my opinion, no. You must allow me to enlarge. In my opinion her disturbances had no connection with this change of life. Her state of mind, her reference to fear, would not come as a result of her period of life. There are people that are at that particular station nervous. I would not attribute her condition to this change of life. Definitely not her nervousness in her particular case."

There is abundant evidence that the conduct of the defendant did adversely affect her health and thereby endanger her life.

The evidence of both cruel and inhuman treatment and danger to her life in this case is as strong if not stronger than many other cases heretofore decided by this court. Hines v. Hines, 192 Iowa 569, 185 N.W. 91; Massie v. Massie, 202 Iowa

1311, 210 N.W. 431; Low v. Low, 232 Iowa 1114, 7 N.W.2d 367; Littleton v. Littleton, 233 Iowa 1020, 10 N.W.2d 57; Murray v. Murray, 244 Iowa 548, 57 N.W.2d 234; Brown v. Brown, 248 Iowa 802, 82 N.W.2d 661; Bouska v. Bouska, 249 Iowa 281, 86 N.W.2d 884; Payton v. Payton, 252 Iowa 772, 108 N.W.2d 358.

V. Appellant claims the trial court's division of the property is grossly inequitable. While we agree with the trial court the record in this case justifies an approximately equal division of the property, an examination of the record persuades us the court's division does not accomplish this result. We believe the decree should be modified to adjust the property distribution.

██ In determining what is a fair and equitable settlement, the court considers the sex, age, health, future prospects of the parties as well as their individual contributions to the accumulated property. Black v. Black, 200 Iowa 1016, 205 N.W. 970.

In this case there is no great difference in the ages of the husband and wife. There seems to be no impairment of health that the separation of the parties will not cure. Defendant apparently complained of his health to plaintiff but no evidence was introduced on this point. Plaintiff has been steadily employed since her marriage to the defendant and her contribution toward the living expenses has been considerably more substantial and dependable than that of the defendant. Income tax returns from 1948 to 1960 reveal the plaintiff earned $31,227 during that period. Defendant's wages were $4151. He lost about $7500 on the farming operation over that period of time. The go-cart track lost $781 during 1960.

Accumulations at the time of trial consisted of an 80-acre farm valued at $40,000 by plaintiff's witnesses out of which must be taken a tract of ground for the go-cart track and a home for the son of the parties; $16,000 in the bank which is all that remains of defendant's inheritance of about $32,000; a contract to sell a house in town with an equity of $2262.05; a 1957 Ford ranch wagon; $1660 worth of beans; farm machinery with a depreciated value of $3100; go-cart equipment with a depreciated value of about $4000; and household furnishings and personal items.

The 80-acre farm was bought by defendant from his earn-

ings during the war for $6000. He did a great deal of work on it himself including the erection of a nice home, tiling and other improvements. He purchased and paid for the farm machinery and go-cart equipment. The $16,000 is the remainder of his inheritance on which there is a capital gain tax due of about $2500. While most of the accumulations seem to have resulted from the defendant's efforts, it is clear that the family received the bulk of its support through the years from the earnings of the plaintiff. This in our opinion justifies a near equal division of the property.

The trial court gave the plaintiff the household furnishings listed in Exhibit B, the land contract valued at $2262.05, her personal effects and a judgment in the amount of $30,000. This figure was based upon an estimated estate of about $73,000 including defendant's full inheritance of $32,000 and the farm at $40,000 less debts of $10,000. This award assumes the accuracy of the valuation of the farm and overlooks the fact that only $16,000 cash remains from the inheritance.

We hereby modify the property division as follows: We confirm the award to the plaintiff made by the trial court of the personal property listed in Exhibit B and the equity in a certain land contract dated 24th February, 1960, with a value of $2262.05. We award her cash in the amount of $7500 which is approximately one half of the value of the bank account and beans less $2500 capital gains tax due on the inheritance. She is also to be awarded her personal effects. All other personal property not specifically awarded to plaintiff is hereby given to the defendant.

Interest in the farm described as the E½ of NE¼ of Section 16, Township 97 North, Range 20, West of Fifth P.M. in Cerro Gordo County shall be divided equally between the plaintiff and defendant, except that defendant shall have the option to purchase plaintiff's interest therein for $20,000 for a period of 90 days from and after the date judgment is entered by the trial court in accordance herewith. In the event defendant does not exercise the option hereinabove given him, and the parties cannot agree upon any other disposition of the property, the trial court may appoint a referee to sell said property, pay the

necessary costs and distribute the proceeds equally between the parties.

In view of the disposition of the property, the appellee's application for additional attorney fees for her counsel is denied.

The decree is therefore—Modified and affirmed and remanded to the trial court for a decree in accordance herewith.

All JUSTICES concur.