Lois GERK, Appellee,

v.

Joseph A. GERK, also known as
J. A. Gerk, Appellant.

No. 52953.

Supreme Court of Iowa.

May 7, 1968.

Cummings & Kratchmer, Osage, for appellant.

William Pappas, Mason City, for appellee.

LARSON, Justice.

Plaintiff Lois Gerk filed her petition for divorce against defendant Joseph A. Gerk, also known as J. A. Gerk, on January 6, 1966, alleging the ground set out in section 598.8(5), Code 1962, as "such cruel and inhuman treatment toward the plaintiff as to endanger her life." She asked custody of one of their two sons, child support, alimony, a division of the parties' real and personal property as the court deems reasonable, and costs and attorneys' fees.

Defendant filed a motion to dismiss plaintiff's petition on the grounds that the allegations were insufficient to support a decree of divorce and that this cause had been before the court in a separate maintenance suit in Worth County wherein relief was denied. He also filed a motion to strike paragraph 4 of the petition for the reason that it does "not contain allegations of fact sufficient to support a decree of divorce." Both motions were overruled on February 10, 1966, and, pursuant to a denial of the allegations of cruel and inhuman treatment and defendant's affirmative allegation of res judicata and estoppel, the cause was tried to the court on June 19, 1967.

Following trial, the plaintiff was granted a divorce. The property of the parties was divided by giving plaintiff the household furniture in her possession, a chest with keepsakes at the farm homestead, one-half of the 8,000 bushels of corn on the two farms, one-half of the growing crops on

one farm less certain costs at the time of harvest, title to that farm of 160 acres, one-half of $21,500 in Series "E" United States Savings Bonds, one-half of an account in Mutual Federal Savings and Loan Association of Mason City (less an offset) valued at $2,080.55, and one-half of a certificate of deposit of $7,000 in the United Home Bank & Trust Company of Mason City. Support money of $250.00, as previously ordered by the court, and the costs of this suit were also ordered paid by defendant, but no additional attorneys' fees were allowed. Defendant appeals.

In his appeal defendant relies upon four propositions for reversal. He contends that the trial court erred in allowing testimony as to incidents which occurred prior to the time judgment was entered in the separate maintenance action in Worth County on June 19, 1964, that the court committed prejudicial error in its rulings and conduct at the trial, that the court erred in granting a divorce to plaintiff on the relevant evidence, and asserts that, if the divorce was proper, the provisions for property settlement were not just or fair.

A phase of this domestic turmoil was before us in Gerk v. Gerk, 259 Iowa 293, 144 N.W.2d 104, where we upheld a judgment against defendant of $60.00 per month support money for the youngest son Jerry, who was then a student in Mason City, Iowa. Jerry was married in December 1966 and his custody and support are no longer issues in this case. The other son Tim is of age.

I. Perhaps the first issue to be resolved is whether evidence as to incidents which occurred in the marriage relationship prior to June 19, 1964, the date of the separate maintenance decree, was improper, and whether its consideration by the court here requires a remand, even though the court stated the evidence was accepted for the purpose of "history". It is well settled in this jurisdiction that the doctrine of res judicata is applicable to divorce and separate maintenance actions, and the rule of substantive law governing plaintiff's right to separate maintenance and divorce are applicable in such cases. As pointed out in Peters v. Peters, 249 Iowa 110, 115, 86 N.W.2d 206, 209, the general doctrine of res judicata is too well settled to justify an extended discussion here. Its basis is that a matter once decided is finally decided and may not be again litigated. From the record we learn that the separate maintenance action was submitted March 19, 1964. Thus, defendant's acts prior to that date cannot properly be considered in this suit to establish her allegation of cruel and inhuman treatment, but this does not mean that a second petition on the same ground cannot be maintained if it is based upon different acts, all of which were committed after the date of the former trial. Cohen v. Cohen, 194 Ga. 573, 22 S.E.2d 132, 133. From this record we have some doubt that the trial court so restricted its consideration. Nevertheless, only proof of new facts occurring subsequent to an adjudication on the merits in the separate maintenance action was proper for consideration by the court, and we adhere to that rule in our review here. No remand on that ground is required.

II. Our review is de novo, and we ordinarily give weight to factfindings of the trial court, especially where based on relevant and competent evidence and where the credibility of the witnesses is involved. However, we are not bound by those findings and, because of the evident hostility of the trial court toward defendant in this case, we accord little or no weight to the trial court's findings and must decide for ourselves whether the party having the burden of proof has carried that burden. Elliott v. Elliott, 259 Iowa 1286, 147 N.W.2d 907, 909; Cimijotti v. Cimijotti, 255 Iowa 77, 79, 121 N.W.2d 537, 538; Jones v. Jones, 255 Iowa 103, 106, 121 N.W.2d 668, 670; Britven v. Britven, 259 Iowa 650, 145 N.W.2d 450, 451; Bullocks v. Bullocks, 259 Iowa 496, 144 N.W.2d 924, 926; Arnold v. Arnold, 257 Iowa 429, 433, 133 N.W.2d 53, 56, and citations.

III. The burden is upon the plaintiff to prove defendant's conduct toward her was cruel and inhuman and that her life was thereby endangered. Section 598.8 (5), Code 1966; Burlingame v. Burlingame, 260 Iowa 18, 148 N.W.2d 493, 494; Jewett v. Jewett, 252 Iowa 883, 886, 109 N.W.2d 36, 37. There is little dispute as to the acts complained of, but this controversy revolves around their sufficiency, purpose, and reasonably-apprehended effect on this plaintiff.

IV. There are many courses of conduct other than outright physical violence which are sufficient to satisfy this requirement. Mental cruelty will suffice. Hylarides v. Hylarides, 247 Iowa 841, 842, 76 N.W.2d 779. We have said any mistreatment which deprives a person of needed rest and peace of mind and affects the nervous system so health is undermined may endanger life as effectively as physical violence. Arnold v. Arnold, supra; Cimijotti v. Cimijotti, supra; Hancock v. Hancock, 257 Iowa 119, 123, 131 N.W.2d 757, 760. This is especially true, we have said, where the danger to life is reasonably to be apprehended. Smith v. Smith, 258 Iowa 557, 560, 139 N.W.2d 453, 456; McMurray v. McMurray, 256 Iowa 97, 100, 126 N.W.2d 336, 338; Weatherill v. Weatherill, 238 Iowa 169, 187, 25 N.W.2d 336, 346; Phillips v. Phillips, 251 Iowa 1310, 1312, 104 N.W.2d 832, 833.

Although mental cruelty is usually shown by a continued course of wearing conduct which strains the nerves and sensibilities of the spouse and which in time may add up to serious damage to health (Hand v. Hand, 257 Iowa 643, 645, 133 N.W.2d 63, 65), it has been held a single occurrence of extreme cruelty, if sufficiently serious, might in a given case constitute grounds for divorce. Patzner v. Patzner, 250 Iowa 155, 157, 93 N.W.2d 55, 56; Arnold v. Arnold, 332 Mich. 542, 52 N.W.2d 211, 212. Obviously, the mental condition or sensitivity of the spouse must be considered in a determination of whether the act or acts amount to cruelty. Thompson v. Thompson, 186 Iowa 1066, 1068, 173 N.W. 55, 5 A.L.R. 710, 711; Alberhasky v. Alberhasky, 250 Iowa 986, 993, 97 N.W.2d 914, 919.

V. Although the law and the legal principles involved are well established, we have recognized that legal precedents are of little value in cases of this type. Each case must, from necessity, depend upon the specific facts involved. Fritz v. Fritz, 260 Iowa 409, 148 N.W.2d 392, 395; Zuerrer v. Zuerrer, 238 Iowa 402, 404, 27 N.W.2d 260, 261; Leigh v. Leigh, 247 Iowa 358, 360, 73 N.W.2d 727, 729.

VI. The problem presented by this appeal, then, is whether the plaintiff has established, by a preponderance of the relevant evidence, acts of mental cruelty endangering her life which occurred subsequent to the submission of the separate maintenance suit.

Appellee contends her evidence clearly showed under the circumstances that defendant's acts toward her since March 19, 1964, were cruel and inhuman, that due to her delicate mental condition, well known to him, they were sufficient to endanger her life, and that this result was reasonably apprehended by him. This vital contention requires a brief summary of the evidence.

Plaintiff left the family home in 1961 and took up residence in Mason City, Iowa. For some time prior thereto she had suffered from a mental disorder, first recognized by defendant when it appeared his wife and their elder son Tim could not get along together. In 1960 he sent Tim to live with plaintiff's mother in Mason City and also provided some psychiatric treatments for plaintiff. When she left the farm in 1961, she took with her the younger son Jerry and a jointly-owned $8,000 certificate of deposit. She cashed the certificate and used those funds to maintain herself and son for some three years thereafter.

Defendant's frugal habits did not appeal to her, and his refusal to furnish support for her and the son outside the family home resulted in several lawsuits, one of which reached us in Gerk v. Gerk, supra. Two other efforts by plaintiff failed. She attempted a partition action involving the jointly-owned 160-acre farm, but failed when the court held her right was only that of survivorship. Her separate maintenance suit was denied when it appeared defendant had not refused to make suitable provisions for her in his own home. Of course, a husband is bound to make suitable provisions for his wife at his own home only, and if she willfully abandons him without just cause she may not require him to maintain her separately elsewhere. Keefe v. Keefe, 259 Iowa 85, 143 N.W.2d 335, 337; Peters v. Peters, supra, 249 Iowa 110, 114, 86 N.W.2d 206, 208. Here, as to acts committed prior to the submission of the separate maintenance action, the question as to "just cause" was determined adverse to her.

On May 7, 1964, plaintiff and Jerry went to the farm home to wash some clothes and again to seek money from defendant to pay their delinquent rent and food bills. The defendant locked the house and refused to talk to them or allow them to wash their clothes. Plaintiff admitted she became frustrated and upset and threatened to smash an empty wine bottle on his tractor and do other acts to disable the machines; whereupon defendant grabbed her from behind and pulled her away from the tractor. Jerry, thinking his mother was being choked, threatened defendant with a four-pound hammer. Defendant then released his hold on plaintiff and she fell to the ground. Jerry chased his father out into a nearby field and he and his mother left. Jerry testified: "My mother was terribly upset. Every time we had to go out there she just dreaded going out there." After this incident, defendant sought and obtained an injunction forbidding plaintiff and Jerry access to the farm.

Nevertheless, about July 19, 1964, pursuant to certain conditions imposed by defendant, plaintiff and Jerry returned to the farm to live. Plaintiff testified that she and Jerry remained there approximately three weeks, departing on or about August 9. Defendant testified: " * * * I always told her that she was welcome any time if she was coming back in good faith * * *." He also testified that, while plaintiff was there, she did not cook his meals or accompany him to church, and she slept in a separate bedroom and even placed her stove in front of his so that he had no access to it; that in one of their arguments plaintiff told him the reason she moved back was "to establish a basis for another suit." Plaintiff denied making this statement and said: "I had to be out there because there was no other place to go. There was no other roof to put over our head."

Jerry testified that during the time they were there his mother "thought she would be nice and wash some of his clothes and try cleaning up the house but he didn't have any appreciation for it at all." He also testified that "if he [defendant] wasn't hollering at Mom, he was usually after me" and on one occasion he "told me if I didn't quit stealing his tools and stuff that he was going to have me committed to Eldora." This latter threat during that period, the trial court found, was one of the three major upsetting acts or misconduct which amounted to extreme cruelty.

It was during that period that defendant signed an information for a commitment of plaintiff to the Cherokee mental institution. He testified that prior to filing the information he discussed the problem with his father and his priest. He did not discuss it with plaintiff nor consult her former psychiatrist. Subsequent to a hearing on the information, commitment was denied. The effect of being served with notice, of being taken before the commission and the subsequent hearing, was great upon plaintiff. Concerning it, plaintiff

testified: "He had not discussed the matter with me. * * * When I was brought into the hearing I felt very small, very insignificant, very unimportant, sort of like a criminal. * * * The proceeding depressed me and frightened me."

Jerry testified: "My mother was upset about the effort of my father to have her committed to Cherokee. * * * She was very upset about that."

It has been held such an attempt to commit one's spouse to a mental institution, not made in good faith, is alone a sufficient act of cruelty to sustain a decree of divorce. Patzner v. Patzner, supra, 250 Iowa 155, 157, 93 N.W.2d 55, 56; 24 Am. Jur.2d, Divorce and Separation, § 57.

Defendant's reluctance to furnish funds for plaintiff's use while she was at the farm also caused her deep concern. She testified: "* * * I asked him [defendant] for money to buy gas for the car so I could get to work, and he said no, you are working, you buy your own gas, buy your own groceries. I said, aren't you supposed to support me. He said I am supporting you. I am furnishing a roof over your head. * * * This lack of money made it hard for me to sleep and difficult to concentrate on my work. I had feelings of wanting to destroy myself again. * * * I had suicidal impulses. I thought of going to sleep and never waking up." Jerry corroborated this testimony and explained they left the farm to avoid those consequences.

We think the evidence is sufficient to establish mental cruelty and tends to support the conclusion that defendant's conduct so affected her mental health as to endanger her life.

■ Dr. Miles Pothast, a clinical psychologist who had treated her in 1961, testified in response to the question of whether defendant's actions would have an injurious effect upon her health that "* * * such conflict and such violent inner action couldn't help but make a person feel more worthless who already had difficulty in feeling adequate in the world. * * * Destructive is the only word for it. There are many ways it could be destructive. It lessens a person's feeling of self-worth * * *. If a person doesn't feel they are worthwhile, they become overtly or covertly destructive, self-destructive, can turn to either retreat from others or alcohol or they can actively take their own lives." There was no objection to the competency of this expert testimony, and we believe it was proper. As bearing thereon, see Miller v. Miller, 237 Iowa 978, 987, 23 N.W.2d 760, 765, and citation.

Together with plaintiff's testimony as to her feeling of self-destruction after returning to the farm, which was corroborated by her son Jerry, it must be clear those acts during the farm stay in July did endanger plaintiff's life.

■ VII. There is little doubt that defendant was well aware of his wife's mental condition, and it can be reasonably concluded from his acts, as well as his testimony, that he knew or should have known the probable result of any substantial mistreatment of her would endanger her life.

Defendant testified that prior to 1964 "She [plaintiff] was in very bad mental condition * * * she would get hysterical about something and you couldn't reason with her * * *." Defendant himself obtained the professional services of a psychiatrist and psychologist for her in 1960 and 1961. He also said that subsequent to the submission of the separate maintenance action in 1964 he provided psychiatric treatments for her: "I paid my wife fifty dollars a week for seven weeks. She quit going to a psychiatrist, and I quit making the payments in July of 1964. I felt my wife was in need of medical attention because of emotional disturbances." As to his good faith in filing the information to commit plaintiff, he testified: "I knew her condition and that something had to be done and I wasn't

getting anything done here at the local psychiatrist. She had been to Pothast, she had been to Powell, and to Doctor Brindley, * * *." In discussing the commitment matter with his priest, he said: "I told him what the circumstances was and the only way I figured to save this marriage was to have her get some medical treatment."

These and other statements disclosed by the record are sufficient to sustain the trial court's conclusion that defendant did not act in good faith but did reasonably apprehend the consequences of this conduct toward the plaintiff.

VIII. Although we have some doubt that plaintiff carried her burden to show she returned to the family home in good faith, or showed that her conduct while there did not contribute to their failure to re-establish a proper marital relationship, we are satisfied that she has adequately explained that failure due to her unstable mental condition and her lack of support funds, and that she has adequately shown defendant's awareness of that condition. We conclude his treatment of her did endanger her life and that she is entitled to a decree of divorce from defendant.

IX. We are convinced it would do no good to require these parties to make another attempt at reconciliation, and believe it might be disastrous to require it. Plaintiff testified that, since she moved back to Mason City, she took a secretarial course, obtained a good job, and has been feeling adequate and needed. She no longer is depressed, confused, or feels that she wants to die. She received temporary support money in the sum of $250.00 per month during the pendency of this action and, with her net earnings of $43.00 per week, she was able to live well. This situation should not now be disturbed.

The parties have acquired considerable property by defendant's thrifty, almost stingy habits, and his reluctance to part with it seems to have been the root of this dispute. His attitude is somewhat understandable when it appears he has been left alone to shift for himself since 1961. He maintains that, although he may not have used good judgment in his attempt to have his wife committed to the state hospital at Cherokee for needed mental care and treatment without her approval, and in his attempt to prevent his son from continually breaking into his shop and using his tools by scaring him with a threat of Eldora commitment, this was not serious enough to justify a divorce and an almost equal division of their property. Defendant contends he is being punished for making a mistake and that the evidence, at best, did no more than establish that he should have apprehended the consequences of his well-intentioned acts. He admitted those acts, but denied his purpose was to cause her serious mental anguish. The trial court who saw and heard the witness unfortunately disclosed its distrust, even its dislike, of him in no uncertain manner. We cannot approve of the court's hostility toward defendant and his attorney.

■ Although we find sufficient fault on defendant's part to grant this divorce, we cannot under these circumstances find grounds which would justify any monetary penalty. Plaintiff is entitled to a fair and equitable property division and no more.

■ X. In determining what is a fair and equitable settlement, the court must consider the sex, age, health, and future prospects of the parties, as well as their individual contributions to the accumulated property. Cimijotti v. Cimijotti, supra, 255 Iowa 77, 86, 121 N.W.2d 537, 542; Cole v. Cole, 259 Iowa 58, 143 N.W.2d 350, 352; Blaney v. Blaney, 256 Iowa 1151, 1153, 130 N.W.2d 732, 733; Weiland v. Weiland, 255 Iowa 477, 480, 122 N.W.2d 837, 839, 1 A.L.R.3d 377.

There is little difference in the ages of the plaintiff and defendant. There appears to be no present impairment of physical health, and the plaintiff's mental health seems about restored. The future prospects of each are good, although neither has accumulated much since 1961.

The trial court gave plaintiff the smaller of the two farms owned by defendant and about half of the personal property. It did not consider the $8,000 certificate of deposit previously taken by plaintiff and clearly overvalued the farm machinery given defendant. That at best was little more than junk. Plaintiff contributed her efforts to the family accumulations except for the period from 1961 to date. The property to be divided here was acquired solely by hard work and thrift practiced by both parties. Most of the increase in their net worth since 1959 came from rises in real estate values. In fact, the bond and savings accounts since then seem to have been reduced. Continual litigation between them could account for some of this reduction.

■ Considering all the circumstances revealed by this record, we believe the property division should be modified as follows: Plaintiff is to have the 160-acre farm and defendant the 235-acre farm, which they agree seem to have a like value per acre. Plaintiff is to have the furniture and personal items designated in the original decree, and $15,000 in cash. The defendant is given the balance of the personal property. Of course, he must also pay the $250.00 support money previously granted, if he has not already done so.

■ Costs of this suit are assessed to defendant, and he is ordered to pay plaintiff for her attorneys' fees the sum of $1,500 for services connected with this appeal.

Modified and affirmed.

All Justices concur.